UNITED STATES of America,
Appellant,

v.

Sylvan M. BYCK and Beatrice Byck,
Appellees.

No. 20194.

United States Court of Appeals
Fifth Circuit.

Dec. 20, 1963.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, William Friedlander, Myron C. Baum, Attys., Dept. of Justice, Washington, D. C., Donald H. Fraser, U. S. Atty., Richard C. Chadwick, Asst. U. S. Atty., for appellant.

Alex A. Lawrence, Michael Adilman, Savannah, Ga., James W. Dorsey, Atlanta, Ga., Bouhan, Lawrence, Williams & Levy, Savannah, Ga., for appellees.

Before TUTTLE, Chief Judge, and JONES and BELL, Circuit Judges.

GRIFFIN B. BELL, Circuit Judge.

This appeal is from a jury verdict and judgment thereon in favor of taxpayers on a claim for refund of income taxes for the year 1956.[1]  Mr. Byck between the years 1919 and 1959 engaged in many ventures for profit, mostly through the medium of corporations, but some as a member of partnerships, and in others as a sole proprietor.  Most were in real estate development, rental properties, and the construction field.

The claim for refund arises out of the following circumstances.  In 1948 Mr. Byck, together with Mr. Worrell, organized the Byck-Worrell Construction Company for the purpose of building a housing project.  Each paid $12,500 toward the capital stock of $25,000 and each received fifty percent of the stock.

---

1. Mrs. Byck is a party to the suit only because of a joint return.  She was not a participant in the venture in question.

Mr. Byck was president from the beginning and during its existence participated substantially in its management. It was later decided that the corporation would engage in general construction work, and it did so on an extensive basis for some ten years. It was necessary for the corporation to provide performance and payment bonds on construction contracts obtained, and the bonding companies required guaranties from Messrs. Byck and Worrell because of under capitalization of the corporation, and for general security reasons. After several years of successful operation, the construction company ran on hard times while performing work under certain contracts in Atlanta. On defalcation, it was necessary for Mr. Byck to make payments to the bonding companies under the guaranties of over $300,000, including payments totalling $110,170.02 in the year in question. He deducted this amount in full on his income tax return for that year on the ground that it was a business bad debt.[2] This deduction was disallowed by the Commissioner. A deficiency assessment followed which Mr. Byck paid. After denial of refund, the suit here was filed.

A special verdict was returned by the jury on the basis of two questions framed by the court. The first is whether or not Mr. Byck was in a separate and independent business of organizing and promoting corporations and other business ventures. The second, in the event the first was answered in the affirmative, was whether the claimed loss was incurred in connection with that business. The jury answered "Yes" to both questions.

At the close of the evidence, and before submission of the case to the jury, the United States made a motion for directed verdict on the ground that the evidence as a matter of law demonstrated that the loss was not incurred in a separate business of the taxpayer consisting of organizing and promoting corporations and other business ventures. The motion was denied on the premise of a fact question for the jury being present. A motion for judgment notwithstanding the verdict was also denied. The denial of these motions frames the issue here.

■■ The burden was on the taxpayer to show that he was entitled to the claimed deduction. White v. United States, 1928, 305 U.S. 281, 59 S.Ct. 179, 83 L.Ed. 172; and United States v. Virgin, 5 Cir., 1956, 230 F.2d 880. To prevail, it was necessary for the taxpayer to show that he was individually in the business, as claimed; that the organization and operation of the construction company was a part of that business; and that his guaranty and the resultant loss was proximately related to his individual business of organizing and promoting corporations and other business ventures.

The two leading authorities, at opposite poles, are Whipple v. Commissioner, 5 Cir., 1962, 301 F.2d 108; vacated and remanded on another ground, 1963, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288; and Giblin v. Commissioner, 5 Cir., 1955, 227 F.2d 692. The Whipple case

---

2. The deduction is claimed under § 166 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 166:

"§ 166. Bad debts.

"(a) *General rule.—*

"(1) *Wholly worthless debts.—*There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

\* \* \*

"(d) *Nonbusiness* debts.—

"(1) *General rule.—*In the case of a taxpayer other than a corporation—

"(A) subsections (a) \* \* \* shall not apply to any nonbusiness debt; and

"(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.

"(2) *Nonbusiness debt defined.—*For purposes of paragraph (1), the term 'nonbusiness debt' means a debt other than—

"(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

"(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."

had been decided in this court prior to the determination of the instant case in the District Court, as, of course, had the Giblin case. However, the Whipple case had not at that time been affirmed by the Supreme Court in an opinion which in firm and positive language clarified what must appear in order for a taxpayer to sustain a deduction as a bad debt loss on the basis of engaging in the separate trade or business of organizing, financing or promoting businesses.

Giblin, a lawyer, engaged in various ventures, some successful and some unsuccessful, beginning in 1945 and culminating after several years in a bad debt loss in a corporation formed to operate a bar and restaurant. The decision of the Tax Court affirming the deficiency assessment was reversed by this court on the basis that he was regularly engaged in the business of "dealing in enterprises" either as a proprietor, partner, stockholder, lender or in a combination of these capacities, contributing to each enterprise his initiative, energy, and such financial backing as was required. We thought there that he proved that he was regularly engaged in the business of seeking out business opportunities, promoting, organizing and financing them, and disposing of them either at a profit or loss, and for that reason reversed. We referred to that decision in Whipple as having been decided on that basis, and determined that Mr. Whipple was not so engaged. His loss arose out of advances made to a bottling company in which he owned eighty percent of the stock. He had many other corporations, mainly relating to real estate and construction endeavors. We there affirmed the tax court decision supporting the deficiency assessment.

The facts concerning the business promotional activities of Mr. Byck are as follows. He started out in the electrical business at Waycross, Georgia in 1911. Three years later he organized a real estate development which was eventually sold. Upon completion of his service in the Army in 1919 he moved to Savannah and organized Byck Electric Company.

Sometime thereafter he organized Nichols-Byck Realty Company for the purpose of developing real estate in Savannah. After the Second World War he organized the L. & B. Sales Company, a corporation, to deal in surplus government material.

Mr. Byck possessed a knack for business promotion, and people frequently approached him for help in organizing business ventures. The recognition of his ability in this field was frequently seen from 1947 to 1956. In 1947 he was instrumental in promoting Carver Village, a housing project consisting of approximately 350 houses located on the west side of Savannah in which project he also invested. Thereafter he also helped promote the Chatham City housing project, and the Nelson Apartments project at Savannah. Corporations were formed for these purposes. Mr. Byck was approached by several citizens from Albany to assist them in organizing a corporation to build houses at Turner Field near that city, and he played an important part in the organizing of a corporation for that purpose. He also helped promote the Drayton Arms Apartments, a modern apartment building in Savannah, and the Byck-Murphy Concrete Company which manufactured bulk concrete. This company fitted into the construction company and its work, as did the Byck Electric Company.

During this period he was asked to organize the Lamara Apartments undertaking in Savannah, which he did and which he accomplished after trips to Atlanta and to Washington. Other ventures in which he had a promotional role included Sylvan Terrace No. 1 and Sylvan Terrace No. 2, partnerships which purchased property near Savannah for real estate development purposes. The venture was unsuccessful at first but he obtained a second option and was eventually able to put the projects over, along with the participation of others. Byck endorsed notes of the partnerships for bank loans of $100,000 for each of the two partnerships, and also invested

cash. He also promoted the Chatham Villa project in Chatham County, buying, laying out and planning the development. Later he decided to sell Chatham Villa which was subsequently developed by others. In 1952 he engaged in a venture with a Mr. Arnsdorff who was unable to furnish bond on a plumbing job. Mr. Byck signed the bond and went into the venture on a fifty-fifty basis. In 1955, he was a member of a group that undertook to develop a site known as the President Street Project at Savannah. The industrial park which was contemplated there did not materialize due to the lowness of the terrain. Another project on which he embarked was the Beverly Park Subdivision near Savannah. Byck purchased the land which he still owned at the time of the trial. At about this time he was approached with a proposition to take over a ninety nine year lease on the old Pulaski building in Savannah. He organized a group of five persons for this purpose, each having a twenty percent interest in the project but later turned back his stock to the other investors for what he had put into it.

In sum, Byck had been interested in some thirty different business ventures since 1911, most of which were between 1946 and 1956. However, after testifying to these facts, Mr. Byck then testified on cross-examination as follows:

"Q. Which of these corporations, Mr. Byck, if any, did you organize for the purpose of promoting it and selling it? A. Originally planned to promote and sell?

"Q. Yes, sir, at the time you organized them? A. I can't say any of them. I did sell my interest in several of them, but at the time that was not the motive for organizing to sell it quickly.

"Q. Your motive was to operate it as a business? A. Yes, as one of the businesses that I was interested in operating, yes. In several of the real estate developments, now, we did finally sell out all of the lots.

"Q. By going into the business of selling them? A. Yes, by the corporation going into the business of selling the lots, or I personally sold it.

"Q. But you did not sell the entire corporation? A. That was never the original intention of anything that I have gone into that I can remember.

"Q. And in one of these were you paid an actual fee for promotion? A. No. I was always interested in them. That was my fee. I did not go around saying 'if you will give me $50.00 I will help you promote it.' It was known that if you could interest me in it, that I would take the interest and then do the promoting."

Applying these facts to the opinion of the Supreme Court in Whipple, we think it plain that the judgment of the District Court cannot stand. There, the court said:

"Petitioner * * * must demonstrate that he is engaged in a trade or business and lying at the heart of his claim is the issue upon which the lower courts have divided and which brought the case here: That where a taxpayer furnishes regular services to one or many corporations, and independent trade or business of the taxpayer has been shown. * * *

"Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of dem-

onstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debts losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business.

"If full-time service to one corporation does not alone amount to a trade or business, which it does not, it is difficult to understand how the same service to many corporations would suffice. To be sure, the presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a regular course of promoting corporations for a fee or commission, see Ballantine, Corporations (rev. ed. 1946), 102, or for a profit on their sale, see Giblin v. Commissioner, 227 F.2d 692 (C.A. 5th Cir.), but in such cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly through the corporate enterprise. * * * On the other hand, since the Tax Court found, and the petitioner does not dispute, that there was no intention here of developing the corporations as going businesses for sale to customers in the ordinary course, the case before us inexorably rests upon the claim that one who actively engages in serving his own corporations for the purpose of creating future income through those enterprises is in a trade or business. That argument is untenable * * * and we re-

ject it. Absent substantial additional evidence, furnishing management and other services to corporations for a reward no different than that flowing to an investor in those corporations is not a trade or business under § 23(k) (4). * * * " [3]

The examples of "substantial additional evidence" situations given in Whipple were the cases of Maloney v. Spencer, 9 Cir., 1949, 172 F.2d 638; and Dorminey v. Commissioner, 1956, 26 T.C. 940. In the first, the additional evidence was that the taxpayer was in fact in the business of "acquiring, owning, expanding, equipping and leasing food processing plants," in addition to his role as the main investor in the corporations giving rise to the bad debt losses. In the latter, the taxpayer who as an individual was in the produce business, and in need of bananas, invested in a corporation formed to bring bananas to this country from Central America and Cuba. His subsequent losses on loans made to this corporation were allowed as being incidental to and proximately related to the taxpayer's produce business.

The ventures of Mr. Byck by his own testimony did not rise above the level of those of an investor. There is no evidentiary basis for a holding that he was engaged in the business of promoting businesses for a fee, or for resale, or that he was engaged in financing businesses for a fee or commission, or that the loss in question was proximately related to any other business of his as an individual. The facts showed no more than a loss by an investor in a corporation resulting from a transaction entered into to bring profit to the corporation, and thereby to its stockholders.

Viewed then in the light of the explicit language of the Supreme Court in Whipple, a light not available to the District Court when the case was there, it was error to deny the motion of the United States for a directed verdict, and for judgment notwithstanding the ver-

---

3. Section 23(k) of the Internal Revenue Code of 1939 is the predecessor statute to § 166, here involved.

dict. The judgment appealed from must therefore be reversed, and the case remanded for entry of judgment in favor of the United States.

Reversed and remanded with directions.