Sol Gelfond and Norma Gelfond v. Commissioner.
Gelfond v. Commissioner
Docket No. 1561-62.
United States Tax Court
T.C. Memo 1964-242; 1964 Tax Ct. Memo LEXIS 97; 23 T.C.M. (CCH) 1444; T.C.M. (RIA) 64242; September 15, 1964
Sidney F. Looker, 570 7th Ave., New York, N. Y., for the petitioners. Rudolph J. Korbel, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The Commissioner determined a deficiency in petitioners' income tax for the year 1959 in the amount of $4,266.54. The only issue for decision is whether the sum of $15,749.59 paid by petitioner as guarantor is deductible as a business bad debt or nonbusiness bad debt. Findings of Fact Some of the facts have been stipulated and are so found. *98 Petitioners Sol Gelfond (hereinafter referred to as petitioner) and Norma Gelfond (hereinafter referred to as Norma) are husband and wife with their residence in Forest Hills, New York. They filed their joint Federal income tax return for the taxable year 1959 with the district director of internal revenue, Brooklyn District, New York. Louis Memblatt & Sons, Inc., (hereinafter referred to as the corporation) was a New York corporation with its principal business being the purchase and sale of draperies, curtains, and curtain piece goods. As of July 1, 1956, the corporation had issued an outstanding 75 shares of common stock owned as follows: Louis Memblatt
25 shares
Stephen Memblatt
25 shares
Gerald Mitchell Memblatt
25 shares At this time the corporation was in financial difficulties and needed cash to continue its business. Louis Memblatt approached the petitioner and Jacob Levine, who was already a director of the corporation, some time in May or June of 1956 with the aim of having petitioner and Levine invest money in the corporation. As a result of these negotiations petitioner and Levine agreed to invest $10,000 each in return for each receiving 37 1/2 shares *99 of stock. On July 2, 1956, an agreement was entered into between the stockholders of the corporation setting forth their respective rights and obligations in connection with the sale and transfer of their stockholdings and their agreement as to the running and management of the corporation. Among other things, the agreement provided for (1) petitioner to be a permanent member of the board of directors, (2) petitioner to be the secretary and treasurer of the corporation, and (3) petitioner to be employed by the corporation at a weekly salary of $200. Petitioner was to be retained as an employee so long as he faithfully performed his duties. Petitioner was required to devote only as much time as he deemed necessary to co-manage the affairs of the corporation. Pursuant to the aforementioned agreement, petitioner paid $10,000 to the corporation and received 37 1/2 shares of its stock. Levine also contributed $10,000 and received a like amount of stock. Between July 2, 1956, and October 1958, petitioner and Norma advanced $40,000 to the corporation. Petitioner was under no contractual obligation to either make any additional contributions to capital or make any loans to the corporation. *100 Of the $40,000, the sum of $15,000 was given to the corporation on July 20, 1956, by a check signed by Norma. The $40,000 was in addition to the $10,000 capital contribution made by petitioner. The books of the corporation reflected $25,000 as a capital contribution and $25,000 as a loan payable to Norma. After July 2, 1956, petitioner devoted all of his time to the business of the corporation. His duties included almost every aspect of the business. However, it was not part of his job to make loans to the corporation or guarantee its obligations. Mainly through his efforts the corporation began to increase the size of its operations. The cutting of materials, which had previously been done by another company, was now being done by the corporation. The volume of business increased and with it the need for additional money. The corporation was not able to obtain additional credit without the personal guarantee of one of its officers. Petitioner was approached in September 1956 by Deering, Milliken & Co., Inc. (hereinafter referred to as Deering), one of the corporation's suppliers, for the purpose of obtaining his individual guarantee. Petitioner agreed to guarantee all purchases *101 made by the corporation from Deering. Petitioner's guarantee was incorporated in a written agreement dated September 21, 1956. With petitioner's guarantee the corporation was able to buy additional goods from Deering and to stay in business. Petitioner was under no legal or contractual obligation to guarantee the obligations of the corporation. Prior to September 1956 petitioner was not aware that he might be called upon to guarantee any corporate obligations. Petitioner volunteered to guarantee the corporate obligations to keep the corporation from folding up. The question of petitioner being called up to personally guarantee any corporate obligations was not discussed prior to September 1956. As a result of financial difficulties, the corporation, on October 27, 1958, made an assignment for the benefit of creditors. Following this, Deering sued petitioner under the guarantee agreement dated September 21, 1956, in the Supreme Court, New York County, New York. Deering was awarded judgment against petitioner on April 16, 1959, in the amount of $27,815.40. This judgment was subsequently compromised for $25,749.59. Petitioner paid Deering on July 14, 1959, the sum of $15,749.59, representing *102 the first installment on the aforementioned judgment. A second installment of $5,000 was paid by petitioner on December 27, 1960, and the final installment of $5,000 was paid on December 28, 1961. On Schedule D of their joint Federal income tax return for the taxable year 1958, petitioner and Norma claimed a long-term capital loss in the amount of $50,000. This represented their total investment in the corporation. Of the $50,000, $25,000 was designated as having been paid for stock in the corporation and the remaining $25,000 was designated as a loan. Petitioner did not guarantee obligations of other businesses or for other persons. Nor was petitioner a dealer in securities. On their 1959 income tax return petitioners deducted the sum of $15,749.59 as a business bad debt. Respondent disallowed the claimed deduction. Opinion Petitioner contends that he was in the business of being an employee and that the loss he sustained arose from a debt incurred in connection with, and was proximately related to, his business. [1] Petitioner relies almost exclusively on Trent v. Commissioner, 291 F. 2d 669 (C.A. 2, 1961), reversing 34 T.C. 910 (1960). Respondent, *103 on the other hand, maintains that petitioner has incurred a nonbusiness bad debt loss resulting in a short-term capital loss pursuant to section 166(d) [2] of the Internal Revenue Code of 1954. We agree with respondent. *104 We agree with petitioner when he states that he was carrying on a trade or business within the meaning of the statute by being the secretary-treasurer and co-manager of the corporation. George P. Weddle, 39 T.C. 493 (1962), affd., 325 F. 2d 849 (C.A. 2, 1963). Petitioner, from July 2, 1956, devoted all of his time and energy to the business of the corporation and in return received a salary of $200 per week. However, a finding that petitioner was engaged in a trade or business is not by itself sufficient to make the debt in question deductible as a business bad debt. The debt must bear a proximate relationship to such trade or business before it can be considered a business bad debt. Kelly v. Patterson, 331 F. 2d 753 (C.A. 5, 1964); Aubrey S. Nash, 31 T.C. 569 (1958); Estate of Dominick F. Pachella, 37 T.C. 347 (1961), affd. per curiam, 310 F. 2d 815 (C.A. 3, 1962); see also section 1.166-5(b), Income Tax Regs.
Petitioner was both an employee of the corporation and a substantial investor. He had the burden of showing that the guaranteeing of the corporate obligations was proximately *105 related to his business of being an employee, Eugene H. Rietzke, 40 T.C. 443 (1963), rather than his status of a stockholder with a substantial investment to protect. George P. Weddle, supra.
The record before us shows that petitioner was approached by Louis Memblatt in May or June of 1956 in order to induce petitioner to invest in the corporation. Petitioner did invest $10,000 on July 2, 1956, in return for 37 1/2 shares of stock, which was a 25 percent interest in the corporation. By July 20, 1956, petitioner had invested $25,000 in the corporation. An additional $25,000 had been loaned to the corporation by October 1958. Whether any part or all had been loaned prior to September 1956 is not shown by the record before us. Petitioner, pursuant to a stockholders agreement entered into on July 2, 1956, became a permanent member of the board of directors and became the secretary and treasurer of the corporation. His salary was fixed at $200 per week. He was required to devote only as much time to the business as he felt was necessary. There was no mention of any loans to be made by petitioner nor was he required as part of his employment to guarantee any *106 obligations of the corporation. In September 1956 when he voluntarily guaranteed the obligations of the corporation he was not in jeopardy of being fired. Accordingly, on this record, we are unable to conclude that the guaranteeing of the corporation obligations by petitioner was proximately related to his trade or business of being an employee. Eugene H. Rietzke, supra; Kelly v. Patterson, supra; George P. Weddle, supra.Moreover, petitioner had a total investment in the corporation of $50,000, part of which represented loans. As soon as he became associated with the corporation, he made significant changes in the operation of the corporation. He increased the volume of business and for the first time the corporation did its own cutting of materials. We cannot say on these facts that petitioner has borne his burden of proving that he was not significantly motivated by his desire to protect his substantial proprietary interest in making the guarantee in question, Eugene H. Rietzke, supra, and only indirectly saving his job through the saving of his investment. Kelly v. Patterson, supra.See also United States v. Byck, 325 F. 2d 551 *107 (C.A. 5, 1963). As we stated previously, petitioner places his main reliance upon Trent v. Commissioner, supra; wherein loans made by a minority stockholder to a corporation to retain his job with the corporation were held to be business debts. There the taxpayer was required to pay $5,000 to obtain a one-third interest in the corporation and was informed that he would be expected to make loans to the corporation from time to time. After making loans on eleven different occasions, the taxpayer refused to make a further loan and was fired for not doing so. Petitioner argues that he, too, was a minority stockholder and that he guaranteed the obligations of the corporation, like the taxpayer in Trent, to keep his employment. But unlike the taxpayer in Trent, petitioner was not required to guarantee any corporate obligations to retain his employment nor was he informed at the time of his initial investment that additional advances would be necessary. Furthermore, petitioner's investment was substantially more than the investment by Trent. In Whipple v. Commissioner, 373 U.S. 193 (1963), the Supreme Court indicated that the Trent case was not applicable where *108 "there is no proof * * * that the loan was necessary to keep his job or was otherwise proximately related to maintaining his trade or business as an employee." We feel this is the situation here. It is true that if the corporation was forced to shut down petitioner would lose his job. But, as we said in George P. Weddle, supra: While it is true that an employee-shareholder will indirectly benefit from the corporation's "well-being" since he would lose his position if the corporation closed its doors, we believe that such indirect benefit, without more is insufficient to cause an advance to be proximately related to his trade or business of being an employee. Petitioner not being required to make the guarantee in order to keep his job and petitioner having failed to meet his burden of proof regarding the proximate relation of the guarantee to his trade or business of being an employee, we find the Trent case, as interpreted by the Supreme Court in Whipple, is not applicable here. Decision will be entered for the respondent. Footnotes
1. Petitioner apparently concedes that if he is to get a deduction in this case it must be governed by the provisions of sec. 166, I.R.C. 1954, Putnam v. Commissioner, 352 U.S. 82 (1956), for he makes no argument that the amount paid to Deering was deductible as a loss under sec. 165(c)(1) or (2), I.R.C. 1954. See Eugene H. Rietzke, 40 T.C. 443, 451-452↩ (1963). 2. SEC. 166. BAD DEBTS. (d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation. - * * *
(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩