T.C. Memo. 1996-221


UNITED STATES TAX COURT


PAUL G. GUBBINI, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 23708-93.          Filed May 7, 1996.


<u>Marie L. DeMarco</u> and <u>J. Paul Raymond</u>, for petitioner.

<u>Francis C. Mucciolo</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


WELLS, <u>Judge</u>:  Respondent determined a deficiency of $58,883 in petitioner's 1989 Federal income tax.  After concessions, the issues remaining for decision are:  (1) Whether petitioner is entitled to a business bad debt deduction pursuant to section 166(a)(1) for the worthlessness of certain loans and advances

made by petitioner to Color Trick, Inc. (Color Trick); and (2) whether petitioner may claim an ordinary loss pursuant to section 1244 attributable to the worthlessness of his stock in Color Trick. Unless otherwise noted, all section references are to the Internal Revenue Code as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated for trial pursuant to Rule 91. The stipulated facts are incorporated herein by reference and are found accordingly.

At the time he filed the petition in the instant case, petitioner resided in Dunedin, Florida.

Beginning in 1978 and during the times relevant to the instant case, petitioner was an anesthesiologist. During 1980, petitioner and certain other anesthesiologists formed a partnership known as Anesthesia Associates of Dunedin (medical group) that provided services at a local hospital. Petitioner handled operation of the medical group. Petitioner worked between 40 and 50 hours per week as an anesthesiologist and took 18 weeks of vacation per year.

From 1980 until 1984 or 1985, petitioner invested with a builder in the construction and sale of homes on speculation. Additionally, petitioner and another physician in the medical group owned an apartment building. Petitioner maintained the

building, collected rents, and found tenants. Petitioner sold the building during 1991 to pay expenses connected with his divorce. During 1986, after being approached by an accountant, petitioner, together with two other physicians, invested in a company known as Cinevision. Petitioner expected to reap a profit if Cinevision's business was successful. Cinevision experienced difficulties after purchasing additional equipment to expand its business. Petitioner was involved in meetings with Cinevision's management in an attempt to resolve the difficulties.

A tenant in petitioner's apartment building introduced petitioner to Leland Prentice, who held a patent for a simple and inexpensive process of color printing (process). Leland Prentice had licensed the patent to Prentice Color, which in turn made an agreement with A.B. Dick, a large printing equipment and process distributor, to market the process to print shops. Prentice Color had gone bankrupt, allegedly due to A.B. Dick's failure to market the process, and a lawsuit was being pursued against A.B. Dick to dissolve the agreement to market the process and to recover damages for A.B. Dick's alleged failure to market the process. The litigation was settled in 1991.

Leland Prentice had the right to use the process in two locations, but could not market it, and had come to Florida to set up a print shop using the process. Leland Prentice also hoped to market the process once the lawsuit against A.B. Dick

was resolved. He, however, did not have the necessary resources to exploit his rights in the patent. Petitioner was willing to put money into Leland Prentice's business in order to share in the profits when it became successful.

During October or November 1987, Color Trick was organized pursuant to Florida law. Leland Prentice and his wife, Faye Prentice, were issued 700 shares of Color Trick's stock, Leland Prentice's son, Stanley Prentice, and his wife were issued 100 shares, and petitioner was issued 200 shares, a 20-percent interest in the corporation. Petitioner paid $5,000 for the shares. The directors of the corporation were Leland Prentice, Faye Prentice, and petitioner. Color Trick was an S corporation. On January 28, 1988, Leland Prentice assigned the patent to Color Trick.

From 1987 through 1989, petitioner advanced funds and made and guaranteed loans to Color Trick. Petitioner continued to make loans to Color Trick because he believed its business could be profitable. Petitioner received promissory notes for some of the advances and loans. Petitioner's loans and advances to Color Trick were used to finance its operations and to purchase equipment. From 1987 through 1989, petitioner devoted time and effort to Color Trick's business but received no compensation from Color Trick. During the period of its operation, Color Trick experienced continuing difficulties due to lack of sales, equipment problems, and an excessive number of employees.

On November 23, 1988, Color Trick reassigned the patent to Leland Prentice and his wife in exchange for 200 shares of its stock, which were to be canceled.  On that date, two other investors in Color Trick were each issued 100 shares of Color Trick.  As a condition for advancing more money to Color Trick, on November 30, 1988, Leland Prentice granted petitioner and other investors a lien on the patent, and a financing statement concerning the lien was filed with the Florida secretary of state.  The lien on the patent was the only security petitioner obtained for all of his loans and advances to Color Trick.  Petitioner also considered any damages that might be awarded in connection with the lawsuit against A.B. Dick as a possible source for the repayment of his loans and advances to Color Trick.

During 1988 and 1989, as petitioner continued to advance funds to Color Trick, he acquired additional stock in Color Trick and, by the end of 1989, he had acquired 60 percent of the stock of Color Trick.  During 1989, in order to induce petitioner to continue to advance funds to Color Trick, Leland Prentice and his wife returned the remainder of their stock in Color Trick to the corporation.  The stock was reissued to petitioner and other investors.  The transfer of the shares allowed more of Color Trick's losses to be passed through to petitioner and the other investors.  Leland Prentice continued to work in Color Trick's business after he had given up all of his stock in the

corporation. Stanley Prentice and his wife also returned their 100 shares of stock in Color Trick to the corporation during February 1989.

Toward the end of 1989, petitioner concluded that Color Trick could not generate sufficient income to pay its bills, that its business could not be turned around, and that he could not continue advancing money to the business. Petitioner's efforts to sell Color Trick around that time were unsuccessful. Except for activities connected with winding down its business, Color Trick ceased operations at the end of 1989. Its equipment was sold or foreclosed upon and available funds were used to repay certain creditors, not including petitioner.

Leland Prentice had no assets from which petitioner's loans could have been repaid. Petitioner did not attempt to foreclose on or to sell the patent. The process had become obsolete by the end of 1989 because of the widening availability of digital printers. Petitioner received no repayment of principal or payment of interest with respect to the loans and advances he had made to Color Trick.

On his Federal income tax returns for 1987, 1988, and 1989, petitioner claimed the following losses with respect to Color Trick:

| Year | Loss |
|------|------|
| 1987 | $9,053 |
| 1988 | 42,982 |
| 1989 | 78,356 |

Petitioner reported the income or loss connected with Cinevision as passive income or loss on his 1987 through 1989 returns.

On his 1989 Federal income tax return, petitioner claimed a business bad debt deduction with respect to his loans to Color Trick in the amount of $269,129.  Petitioner's Federal income tax returns for taxable years 1987 through 1990 contain no other reference to any lending activity of petitioner.

OPINION

The first issue we consider is whether petitioner is entitled to a business bad debt deduction pursuant to section 166(a)(1) for the worthlessness[1] of petitioner's loans and advances to Color Trick.  That section provides, in general, for the deduction of debts that become wholly worthless during a taxable year.  Section 166(d), however, limits the general rule, providing that, in the case of a taxpayer other than a corporation, nonbusiness bad debts are to be treated as short-term capital losses.[2]  In general, a nonbusiness bad debt is a

---

[1]
Respondent does not contest the fact that petitioner's loans to Color Trick became worthless during 1989.

[2]
Sec. 166(d) provides:

SEC. 166(d).  Nonbusiness debts.--

(1)  General rule.--In the case of a taxpayer other than a corporation--

(A) subsection (a) shall not apply to any
(continued...)

debt other than a debt (1) created or acquired in the trade or business of the taxpayer or (2) the loss from the worthlessness of which is incurred in a trade or business of the taxpayer. Sec. 166(d)(2). The question whether a debt is a nonbusiness bad debt is a question of fact. Sec. 1.166-5(b), Income Tax Regs. Petitioner has the burden of showing that he was engaged in a trade or business to which the debts in question are proximately related. Spillers v. Commissioner, 407 F.2d 530, 534 (5th Cir. 1969), affg. T.C. Memo. 1967-216; United States v. Byck, 325 F.2d 551, 552 (5th Cir. 1963); Deely v. Commissioner, 73 T.C. 1081, 1092 (1980).

The question of whether a shareholder's loans to his corporation are business or nonbusiness bad debts frequently has been litigated. A worthless debt resulting from a loan by a

---

[2](...continued)
        nonbusiness debt; and

        (B) where any nonbusiness debt becomes worthless
        within the taxable year, the loss resulting therefrom
        shall be considered a loss from the sale or exchange,
        during the taxable year, of a capital asset held for
        not more than 1 year.

    (2) Nonbusiness debt defined.--For purposes of
paragraph (1), the term "nonbusiness debt" means a debt other
than--

        (A) a debt created or acquired (as the case may
        be) in connection with a trade or business of the
        taxpayer; or

        (B) a debt the loss from the worthlessness of
        which is incurred in the taxpayer's trade or business.

shareholder to his corporation may qualify as a business bad debt if the shareholder was engaged in the business of promoting, organizing, financing, and selling corporations. Deely v. Commissioner, supra at 1092. If a shareholder is only an investor, the debt will be treated as a nonbusiness bad debt because the management of one's investments does not constitute a trade or business. Id. In Whipple v. Commissioner, 373 U.S. 193, 202-203 (1963), the Supreme Court set forth the following guidelines for deciding the question:

> Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. * * *
>
> If full-time service to one corporation does not alone amount to a trade or business, which it does not, it is difficult to understand how the same service to many corporations would suffice. To be sure, the presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a regular course of promoting corporations for a fee or commission * * * or for a profit on their sale * * *, but in such cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly through the corporate enterprise * * *

In Deely v. Commissioner, supra at 1093, we concluded that, based on Whipple v. Commissioner, supra at 202-203, a taxpayer claiming to be in the business of promoting, financing, and/or dealing in corporations must show that the activity is conducted for a fee or commission or with the immediate purpose of selling the corporations at a profit in the ordinary course of that business. A taxpayer who seeks a return from long-range investment gains rather than from a quick sale of a corporation after it has become established is more likely to be considered an investor rather than a business promoter. Deely v. Commissioner, supra at 1093-1095. Whether petitioner is engaged in the trade or business of promoting corporations is a question of fact. Smith v. Commissioner, 62 T.C. 263, 268 (1974); see also Commissioner v. Groetzinger, 480 U.S. 23, 36 (1987).

Petitioner claims that he was engaged in the trade or business of a venture capitalist or business promoter and that the loans and advances that he made to Color Trick were made in the course of that trade or business. Petitioner, however, has not established that he was engaged in the trade or business of promoting corporations in addition to his medical practice. We note that petitioner's medical practice was his primary occupation, to which he devoted approximately 40 to 50 hours per week, excluding vacations. Additionally, petitioner admitted that he was not in the business of lending money when he began advancing funds to Color Trick. Moreover, nothing in

petitioner's Federal tax returns that are in the record indicates that he earned income from rendering services as a promoter. Although petitioner claims that he had a reputation in his community as a promoter, there is little evidence in the record to support that claim, and the absence of any indication that petitioner was separately compensated for his activities renders that evidence unpersuasive. Deely v. Commissioner, supra at 1096.

Petitioner points to his activities outside his medical practice to show that he was engaged in the trade or business of being a business promoter, but the activities do not indicate that petitioner was in that trade or business. Although petitioner was involved in building and selling houses on speculation prior to his dealings with Color Trick, the record does not indicate how he was compensated for his efforts, that is, whether he received compensation directly for his services, or indirectly through the success of the ventures. Moreover, that activity had ceased in 1984 or 1985, and it therefore does not indicate that petitioner was involved in a business of developing properties for quick sale during 1987, when he became involved with Color Trick. Petitioner's other activities, such as his ownership of an apartment building and his investment in Cinevision, do not indicate that he engaged in promoting corporations for a fee or commission or for the profit to be derived from quickly selling them after they were established.

Rather, petitioner appears to have sought long-term returns from his ownership interests, which is the hallmark of the investor. Deely v. Commissioner, supra. Although petitioner was actively involved in the management of the apartment building, there is no evidence he was directly compensated for his services. Moreover, it does not appear that he planned to sell the apartment building once it became established; rather, he sold it as a result of his divorce proceedings.

Similarly, petitioner apparently sought a return from Cinevision in the form of enhanced value of his investment, rather than from direct compensation for his services to the corporation. Petitioner, moreover, reported the income or loss connected with Cinevision as passive income or loss on his 1987 through 1989 returns. Petitioner's activities with respect to Cinevision, which consisted of meetings with its management to discuss its difficulties, appear no different from those of an investor seeking to protect his investment. As we discuss below, we reach the same conclusion with respect to petitioner's activities in connection with Color Trick.

The record is also devoid of evidence of other indicia of a business of promoting corporations, such as the active seeking out of opportunities to promote corporations, advertising, the maintenance of a separate office or books of account for such a business, or the preparation of statements of profit and loss

from corporate promotion activities.  United States v. Henderson, 375 F.2d 36, 41 (5th Cir. 1967).

Accordingly, we conclude that petitioner was not in the trade or business of promoting corporations.  Moreover, even if petitioner were engaged in a promoting business, we would not conclude that the business encompassed his activities regarding Color Trick.  Petitioner's activities in connection with Color Trick were more consistent with those of an investor rather than those of a business promoter.  Petitioner's loans and advances to Color Trick were used to finance its operations and to purchase equipment, which furthered Color Trick's business.  Petitioner's rendering of advice and making advances to Color Trick did not in themselves amount to a promotion of the corporation.  United States v. Clark, 358 F.2d 892, 895 (1st Cir. 1966).

Furthermore, petitioner's testimony indicates that the only return he expected for his investments in Color Trick was from dividends or the long-term enhancement of his share holdings generated from the profits to be derived from the success of Color Trick's business.  Petitioner may also have hoped to share in any recovery from a lawsuit against A.B. Dick in connection with a license it was granted to market the process.  Petitioner further appears to have expected some return from the exploitation of the patent once A.B. Dick's licensing agreement was dissolved in connection with the litigation.  Petitioner took no salary from Color Trick, and there is no evidence that he

expected or was entitled to any direct compensation for his services. Although petitioner contended that he did not do so because of Color Trick's financial problems, there is no evidence that he was owed any salary for his services or that he deferred collecting any salary due him. We conclude from the record as a whole that petitioner expected only an investor's return from Color Trick in the form of dividends or long-term enhanced value of his shareholdings.

It does not appear that petitioner planned to sell Color Trick quickly once it became established. Indeed, there is some question whether the business could have been sold, because Leland Prentice was allowed to use his process in only two locations but was not allowed to market it. Rather, an effort was made to sell the business only after petitioner decided that it would not be successful and that he could not continue financing it.

Petitioner also contends that he made advances to Color Trick in order to protect his business reputation after he had induced other physicians in the medical group to invest in Color Trick.[3] As noted above, we cannot conclude from the record in the instant case that petitioner had a reputation as a business

---

[3] Petitioner does not contend that the investments in Color Trick by other physicians with whom he practiced rendered his advances to Color Trick proximately related to his medical practice, or that his medical practice would be in any way affected by the fate of Color Trick.

- 15 -

promoter. It appears to us that, in making the advances, petitioner's motivation was to protect his reputation as an investor. Petitioner also contends that he made advances to Color Trick in an effort to protect the investments of the other physicians who had loaned money to Color Trick. Advancing money to a corporation to protect the investments of others, however, is an indication that the taxpayer is not a promoter. United States v. Clark, supra at 896.

Petitioner also contends that his advances and loans to Color Trick exceeded his initial investment in its stock by 60 times and that this circumstance indicates the lack of an investment motive for the loans and advances. We do not consider the circumstance pointed to by petitioner indicative of the lack of an investment motive given that petitioner (1) acquired additional stock in Color Trick during 1988 and 1989, (2) held 60 percent of its stock by the end of 1989 and (3) was not entitled to compensation for his services to Color Trick. It seems quite plausible to us that petitioner's loans and advances were made to protect his increasing and substantial equity stake in the corporation.

Based on our consideration of the entire record in the instant case, we hold that petitioner's loans and advances to Color Trick, which became worthless in 1989, are nonbusiness bad debts. Whipple v. Commissioner, 373 U.S. at 203-204; United

States v. Byck, 325 F.2d at 554-555; Deely v. Commissioner, 73 T.C. at 1092-1093.

Petitioner alternatively contends that he is entitled to claim, pursuant to section 1244, an ordinary loss of $50,000 due to the worthlessness of his stock in Color Trick.[4]  Section 165(g) provides generally that the loss resulting from the worthlessness of a security (including stock) that is a capital asset is capital in nature, and the allowability of such a loss consequently is governed by the provisions of section 1211(b). The allowable amount of the loss is the adjusted basis of the security provided in section 1011 for purposes of determining the loss from the sale or other disposition of property.  Sec. 165(b).

Section 1244(a), however, allows an individual taxpayer to treat a loss from "section 1244 stock" as an ordinary loss where it would otherwise be treated as a loss from the sale or exchange of a capital asset.  As relevant to the instant case, the aggregate amount of the loss that may be treated as an ordinary

---

[4]  Respondent contends that petitioner raised this issue too late in the course of the instant case for us to consider it. Respondent points out that the issue was not raised in the petition, any amendment thereto, or in petitioner's trial memorandum, and contends that it would be unfair and prejudicial to respondent for us to consider the issue, which respondent asserts was raised for the first time at trial.  Because we decide below that petitioner has not established his entitlement to claim a loss pursuant to sec. 1244, we need not consider whether respondent was surprised and prejudiced by the raising of the issue at trial.

loss pursuant to section 1244 cannot exceed $50,000. Sec. 1244(b). The term "section 1244 stock" is defined to mean stock of a domestic corporation where: (1) At the time of the stock's issuance, the corporation had not received money or other property in excess of $1 million for its stock, as a contribution to capital, or as paid-in surplus; (2) the stock was issued for money or other property (other than stock or securities); and (3) the corporation during its most recent 5 taxable years (or, if less, the period during which the corporation has been in existence) derived more than 50 percent of its aggregate gross income from sources other than royalties, rents, dividends, interest, annuities, and sales or exchanges of stocks or securities. The third test, however, does not apply where the amount of deductions allowed exceeds the amount of the corporation's gross income. Sec. 1244(c). The Commissioner is empowered to prescribe the regulations necessary to carry out the purposes of section 1244. Sec. 1244(e). Pursuant to that authority, the Commissioner has issued regulations requiring a taxpayer to have records sufficient to establish that the taxpayer is entitled to the loss and satisfies the requirements of section 1244.[5] Sec. 1.1244(e)-1(b), Income Tax Regs. We have

---

[5] The Commissioner's regulations previously required taxpayers claiming a loss pursuant to sec. 1244 to attach an information report to the return in which the loss was claimed showing the address of the corporation issuing the stock, the manner in which
(continued...)

held that strict compliance with the requirements of section 1244 and the regulations issued pursuant to it is necessary to obtain the benefits of the section. Moqab v. Commissioner, 70 T.C. 208, 212 (1978); Morgan v. Commissioner, 46 T.C. 878, 889 (1966).

Petitioner contends that he received certain stock in Color Trick that previously had been held by each of Leland Prentice and his wife and/or Stanley Prentice and his wife in exchange for repaying a $110,000 debt of Color Trick.[6] Petitioner bases his claim of a section 1244 loss on that transaction. Petitioner, however, has not established his basis in his Color Trick stock for purposes of computing the amount of his loss pursuant to

---

[5](...continued)
the stock was acquired, the nature and amount of the consideration paid, and, if the stock was acquired in a nontaxable transaction in exchange for property other than money, the type of property transferred, its fair market value on the date of transfer to the corporation, and its adjusted basis on that date. Sec. 1.1244(e)-1(b)(1), (2), and (3), Income Tax Regs., amended by T.D. 8594, 1995-1 C.B. 146. Petitioner did not file such an information report with his 1989 return. In 1995, however, the Commissioner eliminated the requirement of an information report, amending the regulation to require only that taxpayers maintain adequate records to establish their entitlement to claim a loss pursuant to that section. T.D. 8594, 1995-1 C.B. at 147; see also Notice 94-89, 1994-2 C.B. 560. The amendment is effective for all open taxable years beginning after Dec. 31, 1953. T.D. 8594, 1995-1 C.B. at 147. Consequently, petitioner's failure to file an information report is not fatal to his claim of entitlement to a loss pursuant to sec. 1244.

[6]
In view of the circumstances discussed below and our holding that petitioner has not otherwise established his entitlement to the benefits of sec. 1244, we need not address whether that stock was "issued" to petitioner in the manner required by sec. 1244(c)(1)(A).

section 1244. Petitioner testified that he did not receive additional stock in Color Trick for the money he advanced to it, but that the shares were "kickers". Elsewhere on brief, petitioner treats only his $5,000 payment for his initial purchase of Color Trick's stock as the amount of his investment in its stock. Petitioner has not attempted to reconcile the inconsistency of his positions at trial and on brief with his section 1244 claim.

Furthermore, Color Trick was an S corporation, and, consequently, the losses that were passed through to petitioner reduced his basis in its stock. Sec. 1367(a)(2). The basis-adjustment rules of section 1367 are applied before application of sections 165(g) and 166(d) in a taxable year of the shareholder in which a security or debt becomes worthless. Petitioner does not dispute that, on its 1987, 1988, and 1989 returns, Color Trick reported losses of $45,263, $214,910, and $138,267, respectively. On his returns for 1987 through 1989, petitioner claimed losses in connection with Color Trick totaling $130,391. Petitioner has not shown that there was any basis remaining in his Color Trick stock after taking into account the foregoing losses claimed on his returns that would enable him to claim a loss with respect to its worthlessness.

Additionally, petitioner contends that many records pertaining to Color Trick were dispersed after Color Trick ceased operations. We note, however, that the loss of records does not

alter petitioner's burden of proof, but, in such a case, we shall consider credible secondary evidence.  Malinowski v. Commissioner, 71 T.C. 1120, 1125 (1979).  Petitioner relies on certain documents of Color Trick (viz, its articles of incorporation and minutes of shareholders' meetings), certain testimony, and certain of his Federal income tax returns to establish his entitlement to a section 1244 loss.  Certain other records, however, have not been offered by petitioner, such as his stock certificates or the stock transfer records of Color Trick.  We do not accept the statements in petitioner's Federal income tax returns as proof of the facts asserted by petitioner. A tax return is merely a statement of the taxpayer's claim and does not establish the truth of the matters set forth therein. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974); Halle v. Commissioner, 7 T.C. 245, 247-248 (1946), affd. 175 F.2d 500 (2d Cir. 1949). Accordingly, we hold that the evidence on which petitioner relies is insufficient to establish his entitlement to the benefits of section 1244.  Moreover, petitioner has failed to maintain records sufficient to establish that he is entitled to the loss claimed with respect to his stock in Color Trick and that he satisfies the requirements of section 1244.  Sec. 1.1244(e)-1(b), Income Tax Regs.

Accordingly, we hold that petitioner is not entitled to claim an ordinary loss pursuant to section 1244 in connection with the worthlessness of his stock in Color Trick.

To reflect the foregoing and concessions,

<u>Decision will be entered for respondent</u>.