**Loren A. and Jennie DECKER, d/b/a Decker Truck Line, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. No. 908.**

United States District Court
N. D. Iowa,
Central Division.

July 26, 1965.

Maurice E. Stark, Fort Dodge, Iowa, for plaintiffs.

Donald E. O'Brien, U. S. Atty., Sioux City, Iowa, Thomas F. Field, Atty., Dept. of Justice, Washington, D. C., for defendant.

HANSON, District Judge.

This is a suit for the refund of income taxes and assessed interest in the amount of $20,579.83 for the year 1956 and for the allowance of a loss carryback to the year 1954. Plaintiffs also ask for interest on the amount as provided by law. Mrs. Decker is a party to this action by virtue of having filed joint tax returns with her husband, Loren A. Decker. During the period involved, Loren A. Decker owned and operated Decker Truck Line as a sole proprietorship.

The court has jurisdiction of this cause by virtue of Section 1346(a) (1) of Title 28, United States Code, and Section 7422 of the Internal Revenue Code. The parties filed a Stipulation of Facts and the same is incorporated herein.

The plaintiff Loren A. Decker made the disputed loans to a company known as the Glass-Craft Company in the stipulated amount of $43,900.00. The Glass-

Craft Company burned down and was uninsured. As a result of the fire, the debt became uncollectible. The United States claims that this sum cannot be deducted as a business bad debt and that it was not a loan.

The Glass-Craft Company was originally organized in 1953 by Oral Musick, Willard Musick, and Ray Bennett to build and sell fiberglass boats.

At the time of the organization of the company in June 1953, the two Musicks and Bennett each contributed $1,000 in cash and a total of $1,668.50 in tools, materials and equipment. They made further cash contributions from time to time, until by no later than October 16, 1953, they had contributed a total of $13,270.00.

In October of 1953, the taxpayer bought a one-fourth interest in the business for $10,000.00. He paid this amount with two $5,000.00 checks, one dated October 24, 1953, and one dated December 12, 1953.

The parties have stipulated that the advances totalled $43,900.00 exclusive of the amount paid for stock. The first note was given sometime late in 1954 or early in 1955 when the taxpayer and the Musicks calculated that the advances had totalled about $40,000.00.

Interest was decided upon at the time the first note was given, at which time it was agreed that the taxpayer would receive 5% interest, which the parties believed to be the prevailing rate in the area at that time. On occasions the taxpayer asked about the repayment of the money or interest on the money. At such times it was explained and agreed that the business could not really afford to part with the money at that time and that if the taxpayer took the money it would have to be replaced from some other source or the operation would have to be curtailed.

The court in this case cannot help but find and conclude that the $43,-900.00 paid by Decker to Glass-Craft was a loan and not a contribution to capital. As the Government contends, this is a question of fact and the taxpayer has the burden of proof. Matthiessen v. Commissioner of Internal Revenue, 2 Cir., 194 F.2d 659; White v. United States, 305 U.S. 281, 59 S.Ct. 179, 83 L. Ed. 172.

The Government accepts the fact that the transactions were loans in the sense that laymen would consider them to be loans. In their brief, the Government states: "The Government accepts the testimony that when the 'advances' were made it was not considered that the taxpayer was thereby increasing his share of ownership. We agree that the parties expected the money to be eventually repaid. Indeed, considering that the parties undoubtedly believed, as laymen, that payments to a corporation had to be either capital investments, which by their nature increased the payor's share of ownership, or loans, we accept the statement that they believed the payments to have been loans."

The Government apparently does concede that the intent of the parties is a major fact especially where, as in this case, the intent was clearly not an artificial intent designed to avoid tax consequences. The Government sets out in its brief the language to that effect in American-La France-Foamite Corporation v. Commissioner of Internal Revenue, 2 Cir., 284 F.2d 723.

The Government contends that the amounts were not loans because they fail to meet the characteristics of a "classic debt" as set out in Gilbert v. Commissioner of Internal Revenue, 2 Cir., 248 F.2d 399. The Government contends there must be (1) an unqualified promise to pay; (2) a sum certain; (3) a reasonably close maturity date; (4) a fixed percentage in interest; and (5) payable regardless of the debtor's income or lack thereof. The Government states also that " * * * Some variation from this formula is not fatal to the taxpayer's effort to have the 'advance' treated as a debt for tax purposes." The court finds as a fact that the loans in this case were intended to be loans and that the loans substantially

meet the requirements of a so-called "classic debt." The amount was quite certain. It was a large amount. It could be ascertained within a few dollars one way or the other. The Government stipulated to the amount. Interest unquestionably was to be paid. The Government concedes that it was not intended that Decker's ownership was to be increased. While the loan was not actually secured by a mortgage, up to the time of the fire there was property in the Glass-Craft Company which could make Decker feel secure. There is no indication that any loss would have been sustained if but for the fire which destroyed the Glass-Craft property. It does seem clear also that the parties intended a reasonably close maturity date for the loan. At any rate, some loans are long term and this is not uncommon.

On the issue of the loan, the taxpayer contends that the Government never raised this issue at a time when it would have been possible to ascertain more clearly the evidence on this point. The taxpayer believes that the Government should for that reason be estopped to raise the issue. While there appears to be some merit in this contention, the court does not need to decide the issue on that basis. Clearly, the facts show the transaction was a loan even under the legal tests contended for by the Government. It is by no means clear that the United States is correct in giving such a technical meaning to the word "loan." In tax cases, words usually should be applied according to their everyday senses. Hanover Bank v. Commissioner of Internal Revenue, 369 U.S. 672, 687, 82 S.Ct. 1080, 8 L.Ed.2d 187; Bookwalter v. Mayer, 345 F.2d 476 (8th Cir.).

The Government states: "The business with which the taxpayer must associate these loans is his freight business, since he was in no other." The court does find that the plaintiff, taxpayer, was in the freight business. Supreme Court decisions cited on this point are: Higgins v. Commissioner of Internal Revenue, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed.

783; Dalton v. Bowers, 287 U.S. 404, 53 S.Ct. 205, 77 L.Ed. 389; Deputy v. Du Pont, 308 U.S. 488, 60 S.Ct. 363, 84 L. Ed. 416; Burnet v. Clark, 287 U.S. 410, 53 S.Ct. 207, 77 L.Ed. 397.

In Whipple v. Commissioner of Internal Revenue, 373 U.S. 193, 202, 203, 83 S.Ct. 1168, 1174, 10 L.Ed.2d 288, the Court said: "Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities *peculiar* to an investor concerned with, and participating in, the conduct of the corporate business." The Court indicated that the manner in which the taxpayer was to be compensated is an important factor in this determination. The Court, in speaking of a situation where the taxpayer's own business was involved, said: " * * * in such cases there is compensation other than the normal investor's return, income received directly from his own services rather than indirectly through the corporate enterprise, and the principles of Burnet, Dalton, du Pont and Higgins are therefore not offended." In the Whipple case, the Government contended that the worthless debt must be proximately related to the taxpayer's independent business.

The court finds that the taxpayer received compensation for making the loan other than the compensation or return which a normal investor would expect to make on such a loan and that the taxpayer intended it to compensate him in his freight business.

There are many facts in the record to support a finding that the freight business was the primary, proximate, and moving cause of the loan having been made. Some of the evidence is as follows:

Loren Decker, d/b/a Decker Truck Line, delivered or hauled from 50% to 80% of the boats manufactured or produced by Glass-Craft. He started hauling at the end of 1953, after he had acquired stock in the company, and continued until shortly after the Glass-Craft

plant was destroyed by fire in April of 1956. Decker also hauled raw materials such as rosins, lumber, hardware, cloth materials and the like into Glass-Craft. Decker did no hauling for Glass-Craft until he bought stock in the company in late 1953.

At first Decker hauled Glass-Craft boats with his closed-in trailers by sliding the boat or boats in on top of other loads. Where only one or two boats were involved this was a better arrangement than using special boat hauling equipment. Materials were usually picked up on a back haul basis by trucks which had delivered straight load shipments and were returning empty. Special equipment is required in order to haul quantities of these fiberglass boats.

As the boat hauling business increased Decker had a special rig built. This was a long, low, light-weight trailer which could haul from 10 to 15 boats. It was used where more than a few boats were going to a particular destination. It was also used to haul lumber and rosin and other boat materials on return trips. Decker also acquired a special light tractor to pull this boat trailer. The tractor and trailer together cost approximately $3500.00 to $4000.00. At the time of the Glass-Craft fire in April of 1956 Decker had plans to build additional boat hauling trailers.

Some customers picked up boats directly at the Glass-Craft plant. Glass-Craft also shipped boats by other carriers and rail. Decker's rates for hauling boats and materials for Glass-Craft were competitive with those of other trucking firms. However, everything else being equal Decker would have secured the Glass-Craft hauling business because of his position as a stockholder and creditor of that corporation. Information as to Glass-Craft shipments was not segregated but was recorded on the books of Decker Truck Line along with other freight shipments. Glass-Craft paid Decker for only about 50% of the boat hauling done by him, and probably for about 75% of the materials he hauled. Quite frequently Glass-Craft

personnel used Decker Truck Line vehicles without charge to deliver boats or to haul raw materials. However, a record was maintained by Glass-Craft and the parties intended that Decker would be paid for such services and the use of his equipment as business progressed.

Glass-Craft sold boats in all but six states. Although Decker had Interstate Commerce Commission operating authority in several midwestern states for a number of different commodities, such authority did not cover the hauling of boats. He believed he was able to haul boats into other states because he owned capital stock in Glass-Craft. The only other way he would have been able to haul Glass-Craft boats would have been to make application to the Interstate Commerce Commission for boat hauling authority in states outside Iowa. This would have been a lengthy, expensive process with uncertain prospects of success.

Decker has invested in or loaned money to firms other than Glass-Craft in order to secure trucking business. He has also invested in other firms in order to be able to haul their products to states in which he did not have operating authority or rights, similar to his investment in Glass-Craft.

Decker anticipated trucking revenue from Glass-Craft would have amounted to from $50,000.00 to $100,000.00 or more per year within three or four more years of operation if the fire had not occurred in the spring of 1956. Another boat company, Span-America Boat Company, which was started by the Musicks in late 1957 shortly after they left Glass-Craft, produced boat hauling revenue within a few years after its organization in excess of $50,000.00 per year. Payments by Span-America for hauling materials in its peak years of 1960–1962 were from $80,000.00 to $90,-000.00 per year. A third fiberglass boat company, Fort Dodge Boat Company, was organized in April of 1957 by some individuals who had also been with the original Glass-Craft corporation. While the operations of Fort Dodge Boat Com-

pany were on a smaller scale than those of Span-America and the reorganized Glass-Craft corporation, they were still substantial. In 1958 Fort Dodge was described in a local newspaper article as the "willow run of the fiberglass boat industry." The three boat companies operating in Fort Dodge during the late 1950's were either an outgrowth of the original Glass-Craft, Inc., or were organized by persons who had been employed by that corporation. Following the fire in the spring of 1956 Glass-Craft was taken over by third parties and reorganized under the name of Glass Craft Boats, Inc. The new president of that company forecast an increase of 500% in sales for the company for 1957 over those of 1956. This same individual stated in June of 1958 that the glass boat industry had taken a 300% jump in overall production and sales nationwide during the five years preceding 1958.

The Government disputes the fact that Decker could haul boats without a permit on the basis of his ownership of stock. Whether the Interstate Commerce Commission actually permits this is not the issue in this case. Decker believed that he could haul the boats on this basis and did in fact so do it. He did this for 2½ years without any trouble with the Interstate Commerce Commission. He never engaged in any subterfuge in so doing. Obviously, the Interstate Commerce Commission must have been aware of this operation.

Decker had all the trucking equipment he needed during the years in question. He also had adequate resources to buy any additional equipment or to cover any other expenses relating to his trucking business which he might have deemed necessary or desirable. Any efforts he might have expended to try and secure other trucking business would not have been as productive from a freight revenue standpoint as his efforts to increase Glass-Craft trucking business.

Because of the unfortunate fire, Decker was never able to achieve his goals in the boat hauling business. His boat hauling business was on the increase from 1954 into 1956. The fire caused the business to end just at the point when it apparently was going to really become worthwhile. The gross revenue received by Decker for hauling boats increased during this period, but it is not an accurate record because Decker had also done much hauling for Glass-Craft on credit for which he would have been compensated but for the fire. After the fire, Decker became disillusioned and sold his special boat hauling rig and stayed completely out of the boat hauling business.

There have been several Circuit Court decisions handed down on this problem since the Whipple case. In Bodzy v. C. I. R., 321 F.2d 331 (5th Cir.) and United States v. Barnes, 327 F.2d 986 (5th Cir.), the problem was different than the present case. There was no business of the taxpayer independent of the corporation to which the money was loaned. The question as to which of two businesses caused the loan was not at issue as it is in the present case.

In Weddle v. C. I. R., 325 F.2d 849 (2nd Cir.), the court did grapple with the problem of the present case. Although factually the case is quite different from the present, the language is important. The majority opinion states:

"Some passages in the Tax Court's opinion, if read alone, might suggest that the court was proceeding on what we would regard as an erroneous view of the law, namely, that a taxpayer like Mrs. Weddle has the burden of proving that her 'primary' motivation was to protect the trade or business of corporate employment in order to be entitled to the deduction. That is not what is said either by the statute or by the Regulations, which the Supreme Court inferentially approved in Whipple v. C. I. R., 373 U.S. 193, 204, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963). In the law of torts, where the notion of 'proximate' causation is most frequently encountered, a cause contributing to a harm may be found 'proximate'

despite the fact that it might have been 'secondary' to another contributing cause. See 2 Yarper & James, The Law of Torts, §§ 20.2 and 20.3; American Law Institute, Restatement, Torts, §§ 432(2), 433, 439, 875, 879 (1939); Restatement Second, Torts, § 443A at 54 (Tent. Draft No. 7, 1962), § 442B at 29 (Tent. Draft No. 9, 1963). So here, particularly in view of the back-handed wording of § 166, it suffices for deduction that the creation of the debt should have been significantly motivated by the taxpayer's trade or business, even though there was a non-qualifying motivation as well. But this, we believe, was the standard the Tax Court in fact employed."

The concurring opinion by Lumbard, C. J., states:

"Such an expansive definition—which would bring within the ambit of § 166 any loan which is 'significantly' motivated by a desire to preserve the taxpayer's salary interest—is manifestly inconsistent with the long course of decisions in which that section and its predecessors have been considered. These decisions have taught that the courts must take great care to 'distinguish bad debts losses arising from (the taxpayer's) own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business.' Whipple v. Commissioner, 373 U.S. 193, 202, 83 S.Ct. 1168, 1174, 10 L.Ed.2d 288 (1963). In attempting to draw this distinction, as the Tax Court wisely noted in considering Mrs. Weddle's claim, we have no 'scales sufficiently sensitive to be able to ascertain the exact percentage of motivations which impelled (her actions),' and therefore 'we look to the main and dominant reason for (her actions).' "

In United States v. Byck, 325 F.2d 551 (5th Cir.), the taxpayer claimed his separate and independent business to be that of organizing the promoting corporations and other business ventures. The court said:

"The burden was on the taxpayer to show that he was entitled to the claimed deduction. (Citations omitted) To prevail, it was necessary for the taxpayer to show that he was individually in the business as claimed * * * and that his guaranty and the resultant loss was proximately related to his individual business * * *."

When this type of separate business is claimed, it would appear that the purpose of the organization of the company to which the loan was made takes on a significance which it would not have in the present case.

The Eighth Circuit Court of Appeals has used the "primary purpose rule" in a different type situation. Iowa Southern Utilities Company v. C. I. R., 333 F.2d 382 (8th Cir.); Industrial Aggregate Company v. United States, 284 F.2d 639 (8th Cir.). (Those two cases involved the attempt to deduct attorney fees as expenses. The Court concerned itself with the primary purpose of the litigation in which the expenses were incurred.)

Rabkin & Johnson, Federal Income Gift and Estate Taxation, treats this subject in Volume 3, Section 35.01(4)(5). The deduction has been disallowed where the prospect of the loan helping the independent business was too remote, not likely to help in the near future, and where the loan was made to help recoup an investment in the business which receives the loan. In the Code of Federal Regulations, T. 26, Section 1.166–5(b), this problem is covered. That section states in part as follows:

"The question whether a debt is a non-business debt is a question of fact in each particular case. The determination of whether the loss on a debt's becoming worthless has been incurred in a trade or business of the taxpayer shall, for this purpose, be made in substantially the

same manner for determining whether a loss has been incurred in a trade or business for purposes of section 165(c) (1). For purposes of subparagraph (2) of this paragraph, the character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception provided by that subparagraph."

The Government's brief considers most of the cases on this issue which have been decided in favor of the taxpayer. An attempt is made to distinguish these cases on a factual basis. This tends to show that this is an area wherein the facts are different in each case and each case must be considered on its own facts. The Government in distinguishing most of these cases, except Cluett v. Commissioner of Internal Revenue, 8 T.C. 1178, says that these were obvious instances wherein the loans were primarily and proximately related to the taxpayer's business.

The Government also cites a large number of cases which have been decided on this issue in favor of the Government and against the taxpayer. In a number of these cases, the Government points out that the case was decided against the taxpayer because the benefit to his business from the loan was too indirect, remote, or speculative. In the present case, however, the benefit to Decker's freight business was direct and unspeculative. The Government argues that Decker's initial basis for his association with Glass-Craft was not as compelling as was the initial basis for the association in Koppleman v. Commissioner of Internal Revenue, 27 T.C. 382, appeal dismissed, 249 F.2d 442 (6th Cir.). The United States, at p. 68 of its brief, states: "There is a constant threat running through the Government's positions,

namely, that the funds advanced were not proximately related to the taxpayer's business of hauling freight * *. The Government's primary contention is that the advances were not loans but were contributions to capital."

Weddle v. C. I. R., supra, and United States v. Byck, supra, have both clearly used the "proximately related" test in this situation. The majority in the Weddle case clearly rejected the primary or main and dominant purpose as the test in this type of case. These are the only two Court of Appeals cases dealing clearly with this precise problem since the Whipple case. The Eighth Circuit Court of Appeals has repeatedly stated: "This court has repeatedly held, particularly in tax matters, that the decision of another Court of Appeals should be followed unless demonstrably erroneous or there appear cogent reasons for its rejection." Delk Investment Corporation v. United States, 344 F.2d 696 (8th Cir.); Birmingham v. Geer, 185 F.2d 82 (8th Cir.), C. I. R. v. Condit, 333 F.2d 585 (10th Cir.), and Campbell's Estate v. Commissioner of Internal Revenue, 343 F.2d 462 (2nd Cir.), are not in point in this case. United States v. Drown, 328 F.2d 314 (9th Cir.), reversed a judgment which clearly conflicted with the Whipple case and relied on cases disapproved in Whipple.

This court finds that the loans by the taxpayer to Glass-Craft were proximately related to the taxpayer's freight business in the manner required by the Whipple, Weddle and Byck cases. In the present case, even if the primary or main and dominant purpose test is correct, which the court does not believe it is, still the evidence is so strong in this case that the taxpayer would have to prevail and the court must, therefore, conclude that the $43,900.00 was a loan to Glass-Craft and that it is deductible as a business bad debt.

The parties have stipulated that the amount involved was $43,900.00. Plaintiffs introduced evidence tending to show the amount of the loans was larger than $43,900.00. The court in this instance,

however, feels that the stipulation is binding. On that basis, the court finds the amount of the loan to be $43,900.00. The parties would be free to file a motion to amend this finding pursuant to Rule 52 of the Federal Rules of Civil Procedure in the event plaintiffs seriously contend that they are not bound by the stipulation.

Accordingly, judgment will be entered for the taxpayer in this cause together with interest thereon.

There is no need to consider any of the taxpayer's alternate claims because of the court's finding that the loans are deductible as business bad debts.

It is ordered that the foregoing shall constitute the findings of fact, conclusions of law, and Order for Judgment in this case. Rule 52(a) of the Federal Rules of Civil Procedure.