BELL FIBRE PRODUCTS CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bell Fibre Products Corp. v. Commissioner
Docket No. 7474-74.
United States Tax Court
T.C. Memo 1977-42; 1977 Tax Ct. Memo LEXIS 401; 36 T.C.M. (CCH) 182; T.C.M. (RIA) 770042; February 22, 1977, Filed William H. Krieg and Robert E. Johnson, for the petitioner. Thomas J. Meyer and Paul Plourde, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the 1970 taxable year in the amount of $2,084,981.40. Because of concessions made by the petitioner, the only issue before us is whether gain realized on *402 petitioner's sale of the stock of two corporations, one of which supplied petitioner with raw materials and the other of which transported such raw materials, is taxable as ordinary income or capital gain. FINDINGS OF FACT The stipulation of facts filed by the parties is incorporated herein by this reference. Petitioner, Bell Fibre Products Corporation (hereinafter "petitioner" or "Bell Fibre"), is a corporation organized under the laws of the State of Indiana; it maintained its principal place of business in Marion, Indiana, at the time of the filing of the petition herein. Petitioner timely filed its Federal income tax return for 1970 with the district director of internal revenue, Indianapolis, Indiana. At all times material herein, Bell Fibre was in the business of manufacturing corrugated shipping containers. The two principal materials necessary in such manufacture are linerboard and medium. Linerboard is a smooth-surfaced paper product which can be made either from recycled waste materials to which hardwood pulp is sometimes added (jute linerboard) or from virgin kraft pulp (kraft linerboard). Medium is a fluted paper product usually made from hardwood pulp. One *403 sheet of medium is bonded between two sheets of linerboard in the making of corrugated materials. Because petitioner did not make its own linerboard or medium, but instead purchased such materials from others, it was known as an independent, rather than integrated, converter in the paper industry. Prior to 1961, petitioner purchased kraft linerboard from integrated converters. Independent converters are at a disadvantage in competing with integrated manufacturers. In times of short supply, the independent converter has difficulty obtaining necessary materials. When supplies are long, the integrated company can drive down the price of its finished product below the point where an independent converter can compete profitably. Petitioner, as an independent converter, has had difficulties in securing continuous supplies of linerboard. In particular, petitioner experienced some shortages in 1950 at the beginning of the Korean War. Between 1950 and 1953, George Alfred Bell (Bell), whose family owned petitioner's common stock and who was chief executive officer of petitioner until shortly before his death in April, 1956, discussed with representatives of other manufacturers the *404 possibility of jointly investing in a kraft linerboard mill. Kraft was then a rapidly growing part of the pulp and paper industry. At least one party to the discussions determined that the anticipated kraft linerboard mill would require adequate timberlands. The negotiations culminated in the April 1, 1953, "Woodlands Agreement", appointing Bell and W. Irving Osborne, Jr. (Osborne), the then president of Cornell Paperboard Products Co. (Cornell), as agents authorized to commit the following parties, in accordance with the indicated percentage interests, for the purchase of timberlands and timber rights to an aggregate not in excess of $1,000,000 and for a suitable mill site not in excess of $100,000: Percentage Party
interest
Petitioner
21
Hankins Container Co.
21
Ohio Boxboard Co.
21
Central Fibre Products Co.
15.5
Cornell
15.5
Birmingham Paper Co.
6
100.0
Also on April 1, 1953, the same parties with the same proportionate interests entered into an agreement known as the "Mill Agreement" which authorized a majority of interests to cause the formation of a corporation for the purpose of financing, erecting, and operating a kraft linerboard mill *405 and which contemplated proportionate ownership interests in the mill as well as the mill's products. Timberlands were acquired from time to time pursuant to the Woodlands Agreement. On April 19, 1955, Hankins Container Co. withdrew from the Woodlands and the Mill agreements and sold its interests therein to the remaining parties. In the summer or early fall of 1955, Osborne suggested to the Woodlands and Mill project participants that Gunnar W. E. Nicholson (Nicholson) be employed to develop and manage such projects. Nicholson had earned an engineering degree in Sweden and had broad experience in the pulp and paper industry (including its financial aspects) in Sweden, Canada, and the United States. Nicholson wanted to be president and chief executive officer of the soon-to-be-formed corporation with independence to run a "successful operation," to maintain his office in New York, and to have an option to purchase stock in the company. A letter of intent to carry out Nicholson's objectives was signed. On September 14, 1955, Birmingham Paper Co. withdrew from the Woodlands and Mill agreements and sold its interests therein to the remaining parties. On November 10, 1955, Hoerner *406 Boxes, Inc., purchased an interest in each of these agreements. In January, 1956, Tennessee River Pulp and Paper Company (hereinafter Tennessee) was incorporated under the laws of the State of Delaware for the purpose of constructing, owning, and operating a kraft linerboard mill at Counce, Tennessee. The parties to the Mill Agreement subscribed to Tennessee's stock (which had a par value of $100 per share) according to their respective proportionate interests, as follows: Petitioner
20%
Ohio Boxboard Co.
23%
Central Fibre Products Co.
17%
Cornell
17%
Hoerner Boxes, Inc.
23%
100%
At the first meeting of Tennessee's directors on January 21, 1956, Bell was elected chairman of the board. Further, it was agreed Nicholson would be employed for a five-year term as president. On February 1, 1956, the corporation entered into an employment agreement with Nicholson along the lines of the letter of intent. The agreement, among other things, gave Nicholson an option to purchase $150,000 of Tennessee's common stock at its par value per share. Osborne succeeded Bell as chairman of the board of Tennessee in April, 1956. At that time, Nicholson was authorized *407 to employ an engineering firm to prepare cost estimates and a plant layout of the proposed mill. On April 27, 1957, Hoerner Boxes, Inc., sold its interests in the Woodlands Agreement and in Tennessee proportionately to the remaining parties to the agreement and shareholders of Tennessee. The resulting ownership interests in the agreement and Tennessee were as follows: Petitioner
26%
Ohio Boxboard Co.
30%
Central Fibre Products Co.
22%
Cornell
22%
100%
From 1956 through 1958, Tennessee investigated cost estimates for the proposed mill and possible financing therefor. Nicholson selected a mill site at Counce, Tennessee, because of favorable soil conditions, water and power supplies, and access to three major railroads within 20 miles at Corinth, Mississippi. Mill production was anticipated at 450 tons daily to meet the needs of the owner-companies for kraft linerboard. In connection with its attempt to secure financing, Tennessee and its owner-companies studied various earnings projections for the proposed mill. In March, 1957, F. O. Kanehl, an officer of the Ohio Boxboard Co., furnished C. B. Libbert (Libbert), an officer of Tennessee, [1] with a document *408 entitled "Tennessee River Pulp and Paper Company -- Data Covering Financing Proposal 450-ton Fourdrinier Kraft Mill" wherein it was estimated that the operation of the mill as conceived would, over a twenty-year period, yield substantial profits which would be available to permit the retirement of the anticipated debt necessary to finance its construction. On May 21, 1957, the directors of Tennessee requested Morgan Stanley & Co., investment counselors, to prepare a brochure estimating operating costs, annual profits, and net income for presentation to insurance companies that might have an interest in financing the mill. The final brochure, completed June 10, 1957, presented a favorable profit picture. Both the Kanehl and the Morgan Stanley & Co. figures included projections based on 450-ton daily production of linerboard for 340 days per year at a market price of $127.50 per ton. Moreover, the projections were based upon the assumptions that $43,000,000 and $44,000,000, respectively, constituted the required capitalization, of which $11,000,000 would be equity and the balance would be financed. [2]
*409 A financial forecast was important not only to potential lenders, but also to the owner-companies. Neither Libbert nor Osborne would have recommended that their respective corporations (petitioner and Cornell) continue in a loss-generating mill project. Had the financial forecast been unfavorable, the appreciated value of petitioner's interest in the Woodlands Agreement would have caused it to sell that interest and realize the profit, rather than participate in an unprofitable mill project. Petitioner anticipated profit in terms of equity appreciation from Tennessee as a long-term investment, and, at some point, dividend income. The money market was tight in 1957 and no firm building plans materialized. At one point, one insurance company showed some interest in financing and made the recommendation that a 50-percent shareholder be added to take 50 percent of the mill's production. Petitioner resisted the idea of any owner-company commanding a majority interest in Tennessee. By the end of 1957, the money market changed. Tennessee employed Rust Engineering Company to redesign the proposed mill in terms of a 500-ton daily capacity. Based upon this company's estimate of *410 manufacturing costs, Tennessee requested the accounting firm of Peat, Marwick and Mitchell Co. to prepare a schedule of estimated earnings for a 20-year period interpolating varying assumptions as to price per ton and daily production. Again, a favorable profit picture was projected. [3]
By September, 1958, Tennessee had a fixed contract price bid for construction of the mill and had made substantial progress in getting the financing therefor. It was contemplated that the mill project would move ahead on a $41,000,000 budget of which $27,000,000 would be a 20-year 5-5/8 percent mortgage loan from Prudential Insurance Company (which included sinking fund requirements in varying sums up to $1,750,000 annually). A term loan of $3,500,000 would be borrowed from a group of banks under a Credit Agreement *411 (the loan was to bear interest at 4-3/4 percent and be payable in two equal installments in 1963 and 1964) and the remaining $10,500,000 would be put in by the owner-companies. [4] At this point in time, Tennessee's management was authorized to exercise the options it had on the mill site at Counce, Tennessee, and on a railroad right of way. Because of the location of the mill site, a shortline railroad connection was necessary to connect the mill with the nearby railroad town of Corinth, Mississippi. The options available to the owner-companies were to have one of the major railroads in Corinth build and operate the spur line or to build and operate it themselves. Although the former alternative was initially the more attractive since none of the owner-companies had railroad experience, the owner-companies finally became convinced that the railroad could be operated profitably and that it was in their interest *412 to operate it themselves. On December 11, 1958, petitioner learned that Central Fibre Products Co., Ohio Boxboard Co., and a third company were contemplating a consolidation. If the consolidation materialized, the newly formed corporation would have a 52-percent interest in Tennessee. Petitioner was opposed to any one company having a majority interest in Tennessee and would not proceed to finalize any financing agreements or construction unless the voting control of Tennessee was not in any single owner-company. Tennessee had to execute the construction and financing contracts by December 31, 1958, lest the proposed terms thereof be open to renegotiation. In addition to solving the voting control problem prior to executing the contracts, Tennessee had to implement a requirement of the proposed financing agreement that its shareholders have the right and obligation to purchase the mill's production up to an aggregate of 153,000 tons annually in proportion to their shareholder interests.The financing institutions thought an assured market for the mill's product was necessary to protect their loans. The deadline was met and Tennessee was able to execute the construction and *413 financing agreements after the execution of a "Corporate Action" contract, wherein the shareholders agreed to amend Tennessee's articles of incorporation and bylaws so as to provide that a 66-2/3 percent vote was necessary for all major corporate action. This agreement also provided that the price of Tennessee's linerboard would be the lowest permissible price under the financing agreements (which basically provided for market price less a 10 percent discount while a certain amount of debt was still outstanding and thereafter not less than cost nor more than current list price), but not less than cost plus 15 percent absent a 66-2/3 percent shareholder vote to the contrary. A "Tonnage Follows Stock" agreement was also signed obligating the shareholders to purchase annually the 153,000 tons of linerboard required by the financing institutions and giving them the right to purchase their proportionate share of tonnage in excess of 153,000 tons without the obligation to do so. On December 31, 1958, a Bond Purchase Agreement (covering the first mortgage loan) and a Credit Agreement (covering the term loan) were executed and related documents embodying the terms previously set forth *414 herein were executed. On March 3, 1959, the Corinth and Counce Railroad Company (C&C) was organized to build and operate a common-carrier railroad between Counce, Tennessee, and Corinth, Mississippi. The financing arrangements provided for a $999,900 first mortgage loan from three major railroads with interest at 5-5/8 percent and with an annual sinking fund requirement of $50,000 plus, under certain conditions, 66-2/3 percent of net income before depreciation and certain deferred income taxes; the bondholders were given an option, expiring on March 31, 1969, to purchase the capital stock or properties of C&C at a price to be mutally agreed upon. The shareholders of Tennessee were to purchase C&C stock for $750,000 in proportion to their Tennessee shareholdings. The owner-companies had commissioned financial projections for C&C's operations as they had for Tennessee's operations and they, too, showed a favorable profit outlook for C&C. In the middle of 1959, Ohio Boxboard Company, Central Fibre Products Co., and a third corporation consolidated into Packaging Corporation of America (Packaging). On August 24, 1959, Packaging, petitioner, and Cornell held 52 percent, 26 percent, *415 and 22 percent, respectively, of the Tennessee stock. The shareholders executed an "Owner Companies Agreement" among themselves to consolidate and supersede the Woodlands and Mill agreements and the Tonnage Follows Stock and Corporate Action agreements. In due course, the owner-companies provided petitioner with the required $10,500,000 for its capital stock and subordinated notes (a part of which consisted of a transfer of the timberlands and their interests in the Woodlands Agreement) and provided C&C with the required $750,000 for its capital stock. On February 5, 1960, Cornell merged into St. Regis Paper Company (St. Regis) which thereafter owned 22 percent of the Tennessee and C&C stock. By March, 1961, Tennessee's mill was completed and operating. Not long thereafter, the mill was producing as much as 575 to 600 tons of linerboard per day. Although daily production was increased, it was done so with the needs of the owner-companies in mind. On occasion, the mill was shut down for periods of several days so that annual production would not outrun the amount of linerboard the owner-companies could absorb. During 1964, Nicholson exercised his option under his employment *416 agreement with Tennessee to purchase 1,500 shares of Tennessee common stock ( $100 per share par value) at an option price of $150,000. Unlike Tennessee's corporate shareholders, Nicholson had neither the right nor the obligation to purchase Tennessee's production in relation to his shareholdings. His only motive for the purchase was to share in a profitable investment. By 1964, St. Regis wanted to dispose of its interest in Tennessee because it was in the process of building a mill of its own. Because the sale of such interest to the remaining shareholders (petitioner and Packaging) would give Packaging voting control, negotiations among the owner-companies were not fruitful. By January, 1969, Packaging had become a wholly-owned subsidiary of Tenneco Corporation. Eighty-three percent of the stock of Tenneco Corporation was owned by Tenneco, Inc. In February of that year, petitioner learned that Packaging and St. Regis (which together owned 75 percent of the Tennessee and C&C stock) had agreed to the merger of Tennessee and C&C into another wholly-owned subsidiary of Tenneco, Inc., whereby the Tennessee and C&C shareholders would exchange their shares for the stock of Tenneco, *417 Inc., of which petitioner's share would be worth about 10-1/2 million dollars for its Tennessee shares and about $417,000 for its C&C shares. The merger plans also included the termination of the "Tonnage Follows Stock" agreement. The requisite number of shareholders of Tennessee and C&C voted to accept such merger plans over petitioner's dissent in March, 1969. On May 14, 1969, petitioner instituted an antitrust action against Tennessee, St. Regis, and Packaging in respect of the proposed merger and consequent curtailment of petitioner's sole source of supply of linerboard. The complaint also alleged breach of contract among the owner-companies. In the interim, petitioner explored other possible captive sources of supply which it deemed necessary to its business. In December, 1969, petitioner agreed to sell its interests in Tennessee and C&C to Packaging and to settle the lawsuit. Petitioner would take cash for its Tennessee and C&C shares and would be assured a continued source of linerboard supply for a period of time to allow petitioner to acquire an ownership interest in another mill. An agreement to this effect was executed on February 26, 1970, and the lawsuit was then *418 dismissed. Pursuant to the agreement, petitioner sold to Packaging its Tennessee shares for $11,737,864 and its C&C shares for $457,728. At the same time, Nicholson sold his Tennessee shares for approximately $1,500,000. During the time petitioner owned Tennessee stock and the Tennessee mill was in full operation, petitioner took all of the tonnage it was required to take and exercised its right to purchase excess production. Tennessee came to fulfill 100 percent of petitioner's requirements for the type of linerboard it produced. In fact, petitioner took Tennessee linerboard in excess of its needs and traded the same for needed medium supplies on very favorable terms.
Throughout the period during which petitioner held Tennessee, it received no dividends in respect thereof. [5]
From 1961 to 1970, Tennessee made no linerboard sales to anyone other than its owner-companies. Within this same time frame, C&C primarily provided rail service for Tennessee, although it did provide some service for others. Both Tennessee *419 and C&C earned substantial profits from the time the mill went into operation through 1969. [6] *420 As of December 31, 1969, stockholders' equity as shown by the audited financial statements was as follows: Tennessee
C&C
Common stock
$ 5,150,000
$ 750,000
Retained earnings
15,835,250
1,010,493
Total stockholder's equity
$20,985,250
$1,760,493
*421 In addition to the statutory exceptions, however, another type of property has been excluded from the term "capital asset" by decisional law. This judicial exception covers property that would ordinarily be capital in nature, but for the business context in which it is acquired, and is based on the proposition that "Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss." See Corn Products Refining Co. v. Commissioner,350 U.S. 46, 52 (1955), where purchases of corn futures on a commodities exchange by a manufacturer of corn products were held not to be capital assets because they were an integral part of the taxpayer's business as hedging transactions. The Corn Products doctrine has been held applicable to corporate securities acquired by a taxpayer for business rather than investment reasons. The evolution of this application and of the proper test to be utilized has recently been the subject of an exhaustive analysis by this Court in W. W. Windle Co.,65 T.C. 694 (1976), *422 on appeal (1st Cir. Apr. 26, 1976). In that case, after carefully considering the varying proportions of business and investment motives in situations where both motives exist, we concluded in a court reviewed opinion to which there was no dissent: We are ultimately persuaded to hold that stock purchased with a substantial investment purpose is a capital asset even if there is a more substantial business motive for the purchase. [65 T.C. at 712.] Respondent seeks to avoid the effect of W. W. Windle Co. herein by making two contentions: (1) that petitioner had no investment motive (citing Booth Newspapers, Inc. v. United States,303 F.2d 916 (Ct. Cl. 1962)), or, if it did, that such motive was "insubstantial" and "insignificant"; (2) alternatively, respondent asks us to reconsider our position in Windle and to hold that the tax character of corporate securities is determined by the predominant motive for which it is acquired, thereby giving our stamp of approval to Rev. Rul. 75-13, 1975-1 C.B. 67. [9] We reject both of these contentions and hold for petitioner. *423 Respondent's first contention, insofar as it asserts no investment motive, is totally belied by the record, as embodied in our findings of fact. His contention that if petitioner had an investment motive, it was "insubstantial" or "insignificant" is not only not supported by the record and our findings based thereon, but is directly contrary to the affirmative and probative evidence presented. It cannot be gainsaid that petitioner's motive was predominantly influenced by its desire to assure itself of a source of supply and that its actions throughout the pertinent period, including even its evaluation of the events which led to the disposition of its Tennessee and C&C stock, were keyed to its supply needs. Clearly, those needs were petitioner's paramount concern, but this is simply another way of saying that petitioner was predominantly motivated by those needs. That standard of motivation is not the test. The test is whether petitioner had a "substantial investment motive". In Windle, we indicated that the economic projections for only a two-year period were sufficient to support a finding of a substantial investment motive. We do not, however, construe Windle *424 as establishing a standard which automatically equates projections of profitability with such a motive. [10] Such projections must be considered in the context of all the facts and circumstances of the particular case to be decided. In any event, we think the facts before us even more clearly indicate the presence of a substantial investment motive than those involved in Windle.
Petitioner had the benefit of long-term economic projections of substantial after-tax profit for a period far in excess of two years. Its decision to acquire the stock was not tempered with the degree of risk involved in Windle. Unlike the textile industry involved in Windle, kraft was a new and growing industry. Moreover, there was credible evidence (both written and oral) that, in the absence of a favorable economic picture for Tennessee and C&C, petitioner would not have invested therein. Granted that the potential for dividend income might have been small in the foreseeable *425 future, the fact is that some prospect for such income existed as the projects prospered and debt obligations were satisfied. Nor can we ignore the fact that there was every indication that the value of petitioner's holdings would appreciate in value. Respondent would have us discount the importance of the profit projections, since the owner-companies could adjust the price of Tennessee's products. [11] This power of the owner-companies was severely limited by the price-setting structure required by Tennessee's creditors. [12] Such limitation was not insignificant in light of the fact that the owner-companies understood that no institution would provide financing for the mill in the absence of a pricing structure which would comfortably allow sufficient after-tax profit to provide for working capital as well as scheduled debt retirement. The retirement of debt clearly would cause the owner-companies' equity interests to increase in value. Moreover, respondent's price adjustment argument seems to assume that Tennessee and the owner-companies could ignore section 482 with impunity. *426 Respondent further attempts to support his position by pointing to evidence that the owner-companies limited Tennessee's production to satisfaction of their own manufacturing requirements rather than giving it a free hand to produce as much as it could. We think this does no more than indicate, under the circumstances of this case, that the owner-companies were not seeking to maximize Tennessee's profits. It does not require a conclusion that they were not interested in any profit at all. The other factors to which respondent points in arguing the nonapplicability of W. W. Windle Co. merely establish the predominance of petitioner's business motive and do not justify the conclusion that any investment motive was insubstantial. [13]
*427 In short, we can sustain respondent's contention as to motive only if we disregard a large portion of that evidence and all of the oral testimony. This we are not prepared to do. In the alternative, respondent asks us to repudiate Windle, thereby confessing not only our own error but his as well. [14] Respondent's request rests in part on a claim of need for certainty in this area and the prevention of a whipsaw situation. We can think of no better way to frustrate those admirable goals than by repudiating our very recent decision. If there is any uncertainty or whipsawing in the current status of transactions such as are involved herein, it is in no small measure due to respondent's apparent inability to delineate a consistent position. In short, we adhere to the substantial investment motive test articulated in Windle.
Decision will be entered under Rule 155.* Footnotes
1. Libbert, a certified public accountant, was employed by petitioner in 1955 as chief financial officer. He served as secretary of petitioner from 1958 to 1969 when he became chairman of the board of directors after succeeding John L. Bell as petitioner's chief executive officer, the latter having become president shortly before the death of his father, George Alfred Bell, in 1956 and chairman of the board thereafter. Libbert retired from Bell Fibre in 1970. ↩
2. he Kanehl projections were that a net after-tax profit of more than $1 million could be expected in the first full year of production which would steadily increase over an eighteen-year period to a figure of $2,390,740 at the end of such period. The Morgan Stanley & Co. projections showed an expected annual net after-tax-income of $1,557,869.
The board of Tennessee thought the amount of depreciation assumed by the latter projection was a bit high and tended to overstate the profit picture by about $30,000.↩
3. Based upon an estimated 153,000 annual tonnage production, Peat, Marwick and Mitchell Co. estimated earnings at $1,901,000 for the first year of production steadily increasing to $2,891,000 twenty years later, if such production was sold at $127.50 per ton. All of the financial projections prepared for Tennessee were based on underlying facts and figures prepared by Nicholson.↩
4. This included $1,000,000 cash put in by the owner-companies for Tennessee common stock and $9,500,000 to be advanced in return for Tennessee's subordinated notes. The owner-companies ultimately invested $5,500,000 in subordinated notes and $5,000,000 in common stock.↩
5. C&C's audited financial statements show some dividends were paid. There is contrary testimony in the record. We find it unnecessary to resolve this conflict.↩
6. Annual audited financial statements showed the following: TENNESSEE RIVER PULP & PAPER COMPANY
Earnings Before and After Federal Income Taxes Period
Earnings
Federal Ended
Before
Income
Net 12/31
Taxes
Taxes
Earnings
1959
$ (831,437)
$ (831,437)
1960
(966,591)
(966,591)
1961
1,318,660
1,318,660
1962
3,389,499
$1,509,010
1,880,489
1963
4,898.716
2,541,832
2,356,884
1964
6,346,240
3,047,861 3,298,379
1965
4,781,376
2,239,611
2,541,765
1966
3,179,026
1,448,102
1,730,924
1967
3,233,124
1,264,651
1,968,473
1968
3,051,123
1,529,445
1,521.678
1969
2,127,482
1,053,132
1,074,350
$30,527,218
$14,633,644
$15,893,574
THE CORINTH & COUNCE RAILROAD COMPANY
Earnings Before and After Federal Income Taxes Period
Earnings
Federal Ended
Before
Income
Net 12/31
Taxes
Taxes
Income
1959
$ (53,518)
$ (53,518)
1960
(114,638)
(114,638)
1961
208,901
208,901
1962
116,044
116,044
1963
113,951
113,951
1964
271,729
$ 127,168
144,561
1965
290,553
131,607
158,946
1966
272,329
112,735
159,594
1967
269,056
124,560
144,496
1968
336,290
170,223
166,067
1969
389,210
198,121
191,089
$2,099,907
$864,414
$1,235,493
ULTIMATE FINDINGS OF FACT 1. Petitioner's predominant motive in purchasing the Tennessee and C&C stock was the acquisition of a dependable source of supply of kraft linerboard. 2. Petitioner's secondary, but substantial, motive in acquiring such stock was to realize a profit on its investment. OPINION The issue herein is whether gain realized by petitioner from the sale of its shares of Tennessee and C&C constituted ordinary income or long-term capital gain. Resolution of this issue depends upon whether those shares constituted capital assets. Section 1221
All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year at issue. [7] provides that the term "capital asset" means property held by the taxpayer with the exception of five types of property enumerated therein. SEC. 1221. CAPITAL ASSET DEFINED. [The] term "capital asset" * * * does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; (3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by -- (A) a taxpayer whose personal efforts created such property, (B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or (C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B); (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or (5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.
[8]↩ It is clear that the stock does not fall within any of these five categories. 9. In W. W. Windle Co.,65 T.C. 694 (1976), on appeal (1st Cir. Apr. 26, 1976) (where a loss was involved), respondent took the position that any investment motive was sufficient to cause a corporate security to be a capital asset. In our opinion, we noted that this position appeared inconsistent with the position taken in Rev. Rul. 75-13. See 65 T.C. at 709, n.14. Respondent's explanation is simply that he changed his position after the briefs in Windle were filed. Since Windle was not decided until January 7, 1976, respondent had ample opportunity to bring his changed position to our attention. Not to have done so was disingenuous, to say the least. The confusion thereby created is matched only by the equivocation in the recently decided cases. See 65 T.C. at 709↩ to 712.
10. Compare Booth Newspapers, Inc. v. United States,303 F.2d 916, 919↩ (Ct. Cl. 1962), where the existence of profitability did not preclude a finding that the securities were not capital assets.
11. A similar argument is not made in respect of C&C, perhaps because of Government regulation of rail rates. ↩
12. There is some evidence that the "market less 10 percent" price required in the financing agreement at times could have exceeded the competitive price at which linerboard could have been secured from other sources. In addition, the shareholders agreed, inter sese, that the minimum price would be "cost plus fifteen percent." See p.16, supra.↩
13. Among those factors highlighted are: Petitioner's periodic shortages of linerboard, petitioner's prior need to purchase from integrated converters, petitioner's concern that no shareholder of Tennessee acquire voting control with which it might threaten petitioner's source of supply or the price thereof, Tennessee's sales only to the ownercompanies at controlled prices, repeated reference in petitioner's corporate minutes to the importance of a dependable source of supply, and petitioner's investment in a shortline railroad without any prior interest or experience in railroads.↩
14. See footnote 9, supra.↩