IRVINE P. DUNGAN and CAROLYN DUNGAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dungan v. Commissioner
Docket No. 4448-75.
United States Tax Court
T.C. Memo 1977-324; 1977 Tax Ct. Memo LEXIS 117; 36 T.C.M. (CCH) 1307; T.C.M. (RIA) 770324; September 21, 1977, Filed David M. Herndon, for the petitioners. Thomas F. Kelly, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined deficiencies in petitioners' Federal income taxes as follows: Year
Amount
1968
$18,686.52
1969
1,563.46
1970
1,092.14
*118 This determination involved a number of different issues, all but one of which have been settled by agreement of the parties.The sole question remaining in dispute is whether petitioners' advances to a corporation were contributions to capital, business loans, or nonbusiness loans. FINDINGS OF FACT The parties have filed a stipulation of facts which, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioners Irvine P. Dungan and Carolyn Dungan, a married couple, resided in the State of California at the time of the filing of the petition herein. They filed joint Federal income tax returns for the years in issue, and since Carolyn Dungan is a party to the case solely by virtue of these joint returns, Irvine P. Dungan will sometimes hereinafter be referred to as petitioner. Irvine Dungan was a practicing attorney in California at all times relevant to this case; he carried on his legal practice in the form of a sole proprietorship. However, during 1967 and 1968, he devoted only about 40 percent of his working time to his law practice. The remaining 60 percent of his time was devoted to three businesses which were involved in the *119 general area of commercial music and radio broadcasting. He was not in the business of lending money. The first of these three businesses was a corporation which operated an FM radio station, located in Sacramento, California, with the call letters KSFM. The term "KSFM" will be used hereinafter to refer either to the station or the corporation. During the time relevant to this case, KSFM was only one of the many FM stations in the Sacramento area. It was begun in 1961, and although it operated at a loss from the start, it was increasing in value. A client of petitioner, Bob Dobbins, was affiliated with it. Petitioner served KSFM in several different capacities. He was first asked (by Dobbins) to represent it as an attorney in filings with the FCC and related matters. By the end of 1965, KSFM owed petitioner approximately $14,000 for legal services; however, petitioner never received this amount nor did he receive any other payment for legal services from KSFM between 1962 and the end of 1970. In addition to being the attorney for KSFM, from October 1962 through November 1970, petitioner was its Secretary-Treasurer and one of its directors. But no directors' meetings *120 were held during the period July 1964 through November 1970, and petitioner received no salary for his services as Secretary-Treasurer. By the end of 1965, Dobbins had invested $65,000 in KSFM and he was unable to invest any additional funds. From April 1965 through November 1, 1970, petitioner loaned the station approximately $2,000 per month to cover its operating expenses. During this period, he assumed control of all day-to-day operations of KSFM: he employed personnel, directed music programming, and collected and disbursed all of the corporation's funds. Although petitioner never owned stock in KSFM, he acquired in 1967 an option to purchase the assets and license of KSFM. This option could not be exercised until after March 1970 because, pursuant to FCC regulations, the broadcasting license could not be transferred until that date. The second business in the commercial music area with which petitioner was connected was Sutter Sound Systems ("Sutter"). Petitioner established Sutter in 1965; it was operated as a sole proprietorship. Sutter's business involved the installation and maintenance of intercom systems and background music equipment systems in commercial enterprises. *121 It also contracted to provide uninterrupted background music to approximately 70 clients for a monthly fee. To provide this background music, Sutter purchased long-playing tapes from unrelated third parties. These tapes cost approximately $75 each. The music from these tapes was broadcast by KSFM using an FM "sub-channel" associated with its regular public broadcasting main channel. No lease existed between KSFM and Sutter for the use of this sub-channel. Background music programs broadcast over KSFM's sub-channel could be received only by the heavy duty receivers with special crystals which Sutter supplied to its customers. In addition to these receivers, Sutter also maintained an inventory of tuners, amplifiers, and speakers for use in its business. Sutter personnel lived close to KSFM and assisted KSFM in electrical maintenance, air conditioning maintenance, and in monitoring the music played by the announcers. Sutter's music tapes were changed each morning. The third of petitioner's three businesses in the commercial music field was Standard Production and Recording Company ("Standard"). Standard operated a commercial music recording and production studio in downtown *122 Sacramento. Standard was incorporated in July 1967, opened its doors for business in January of 1968, and was essentially out of business by November of 1968. [1] Petitioner provided substantially all of the financial backing for Standard from July 1967 until September 1968 at which time he stopped supplying funds to the company. The amount in controversy in this case is based upon the loss which petitioner incurred as a result of these advances to Standard. No stock of Standard was ever issued; however, petitioner was in complete control of the corporation because he alone was supporting it financially. [2] He appointed James Barkley as President of the company, and Barkley and his wife managed the day-to-day operations of the business. While petitioner never received any salary from Standard, the Barkleys recived current compensation of $800 per month for their services. In addition, petitioner and Mr. Barkley had an informal understanding that whatever stock was eventually issued would be split between them on a 51/49 percent *123 division. The price which Mr. Barkley would have to pay for his stock interest was left to be agreed upon after Standard had become profitable. Although no stock of Standard was ever issued, Standard had its own bank account, entered into equipment leases (with petitioner as co-lessee), and issued to unrelated third parties promissory notes on which petitioner was the guarantor. No Federal income tax return was filed by or on behalf of Standard for the time during which petitioner controlled the corporation. To the extent that the results of its operations were reported for Federal income tax purposes, they were shown on one of the three Schedule C's filed as a part of petitioner's personal Federal income tax return for 1968. At the trial of this case, the parties entered into an oral stipulation to the effect that "for the years at issue * * * Standard was a viable corporate entity". Standard's operations involved *124 several aspects of the commercial music recording and production business. It made demonstration or "speculative" tapes for aspiring rock and roll groups to send to various booking agents or promoters. In addition, it recorded advertising agency commercials and jingles.During the period from January through August 1968, when Standard was actively engaged in its business under petitioner's control, it received a small amount of income from these activities. Petitioner expected that Standard's operations would benefit his two other commercial music business interests (i.e., Sutter and KSFM), and vice versa. He hoped originally that Standard would produce the special long-plying music tapes broadcast by Sutter to its background music clients. However, petitioner ended his involvement with Standard before it actually produced any such tapes. Furthermore, he expected Standard to produce advertisements, both for Sutter and for unrelated companies, which could be broadcast to the public over KSFM. KSFM offered a special discount to advertisers who used Standard's products, and, in fact, some advertisements broadcast over KSFM were recorded by Standard.Standard did not receive a fee *125 under the arrangement. KSFM broadcast advertisements for the products and services offered by both Sutter and Standard; it accepted as compensation for these broadcasts services rendered by Sutter. Petitioner intended to use Sutter and KSFM personnel in maintenance of the equipment at Standard's studio, but this was not done. He felt that it was advantageous, nevertheless, to have these employees available to "fill in" at Standard if the need arose. Finally, Standard was able to provide space on its premises for the storage of Sutter's inventory of electronic equipment. In addition to the benefits which he expected would accrue to his two other commercial music businesses, petitioner expected Standard to be a profitable operation in its own right. And, in fact, insofar as the record reveals, the primary basis for his decision to stop supplying funds to Standard was that the corporation failed to generate the amount of income which had been anticipated. During 1967 and 1968, petitioner provided funds to Standard both from Sutter's account and from his law office account. These funds were used to pay the rent on Standard's business premises, the costs of labor and materials *126 used to construct an acoustically sound recording and production studio, the Barkleys' salary, the telephone bill, and the monthly installments due on the major equipment used in Standard's business. [3] In all, Standard's operating expenses during this period amounted to about $3,200 per month, while its gross receipts never exceeded about $1,000 in any month and most often were less than that. No notes or other evidence of indebtedness were issued by Standard to petitioner for the funds supplied to Standard. One element of petitioner's understanding with Barkley concerning the future issuance of Standard stock was that petitioner would be repaid his advances in addition to receiving his portion of the stock. However, since most of petitioner's advances went to pay Standard's current operating expenses, since Standard had no other assets of any consequence, and since Barkley had insufficient personal financial *127 resources to pay back these amounts, petitioner and Barkley understood and intended that whatever amounts were repaid to petitioner would be drawn from Standard's expected future operating profits. On his 1968 Federal income tax return petitioner claimed a business loss in the amount of $48,751.77 attributable to his investment in Standard. However, the parties have agreed that the amount in dispute herein is properly stated as follows: Funds from Sutter and Petitioner to Standard
$35,691.92
Less: Funds from Standard to Sutter or
petitioner
13,059.85
Net amount at issue
$22,632.07
Petitioner claims that he is entitled by section 166, I.R.C. of 1954, to deduct in full the net amount of these advances as a business bad debt which became worthless in 1968. The Commissioner does not dispute that petitioner sustained a loss in this amount in 1968; however, he contends that it is deductible only as a capital loss, subject to the limitations of section 1211, either because the advances represented contributions to the capital of Standard, or because, if they were bona fide loans, they were nonbusiness bad debts as defined in section 166(d). *128 OPINION Petitioner was an attorney who in addition to practicing law devoted a substantial amount of his time to three enterprises in the commercial music field. During 1967 and 1968, he advanced the net amount of $22,632.07 to one of these three businesses, Standard Production and Recording Company, a corporation which he had organized and controlled. These advances became worthless during 1968, and we must determine whether petitioner incurred an ordinary or a capital loss in respect of these amounts.We hold that petitioner's advances were contributions to capital, and that he therefor sustained a capital loss upon their becoming worthless. Section 165(g)(1), I.R.C. 1954. Whether funds advanced to a corporation are bona fide loans or are an equity investment in the corporation is a question of fact which must be resolved on the basis of the particular circumstances of each case. See, e.g., Georgia-Pacific Corp. v. Commissioner,63 T.C. 790, 795, and cases cited therein; Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 376, *129 and cases cited therein. While the decided cases have identified numerous criteria which may help distinguish debt from equity, [4] this Court has stated that: [The] determinative question, to which an evaluation of the various independent factors should ultimately point, is as follows: Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship? Litton Business Systems, Inc. v. Commissioner,supra,61 T.C. at 377; see also Gilbert v. Commissioner,248 F.2d 399, 406 (C.A. 2) (Advance is not debt unless there were "reasonable expectations of repayment regardless of the success *130 of the venture."); Root v. Commissioner,220 F.2d 240, 241 (C.A. 9) ("[Stockholder] * * * intends to * * * take the risks of the venture, while [a creditor] seeks a definite obligation, payable in any event."). When judged by this dual test, petitioner's advances to Standard must be considered contributions to capital rather than bona fide loans. To be sure, petitioner testified as to his expectations that his advances would be repaid separately from the eventual distribution of corporate stock which was to be divided almost equally between Barkley and himself. While we do not question the sincerity of this testimony, we do note that (1) there was no definite time set for repayment; (2) the exact amount of advances outstanding at any given time was uncertain, and as a consequence, there was little or no formal documentation evidencing a corporate obligation to repay petitioner; (3) no interest was ever paid to petitioner in respect of these advances, nor, insofar as the record reveals, was any provided for; and (4) it was by virtue of these advances that petitioner had control of Standard's operations. Characteristics such as these typify equity rather than *131 debt. See, e.g., John Kelley Co. v. Commissioner,326 U.S. 521, 530; A. R. Lantz Co. v. United States,supra,424 F.2d at 1333; Curry v. United States,396 F.2d 630, 634 (C.A. 5), certiorari denied 393 U.S. 967. Moreover, wholly apart from petitioner's actual intentions, the advances did not create bona fide debts for Federal income tax purposes, unless his intentions were based on an economically reasonable expectation of repayment independent of the success of the venture to which the advances were applied. Here, there was no such reasonable expectation because not only did Standard not have any other contributed capital (Cf. Hoguet Real Estate Corporation v. Commissioner,30 T.C. 580, 598; Schnitzer v. Commissioner,13 T.C. 43, 62, affirmed 183 F.2d 70 (C.A. 9), certiorari denied 340 U.S. 911), but in addition, it had no substantial assets of any kind, and the bulk of petitioner's advances went to pay its current operating expenses. [5] And, indeed, *132 petitioner testified that he expected to be repaid only from future "operating profits". This was certainly an accurate assessment of Standard's financial position; however, it furnishes convincing support for the conclusion that the advances were capital contributions. Our resolution of the debt-equity question makes it unnecessary for us to consider the Government's alternative contention that if the advances were loans, they were nonbusiness loans. Moreover, in spite of the emphasis which petitioner has placed on the business interrelationship between Standard, Sutter, and KSFM, it is plain from the record that his advances to Standard were made with at least a substantial investment motive. [6] Therefore his investment in Standard was a capital asset in his hands ( W. W. Windle Co. v. Commissioner,65 T.C. 694, appeal dismissed without *133 consideration of this issue 550 F.2d 43 (C.A. 1), certiorari denied     U.S.    , (June 13, 1977); Bell Fibre Products Corp. v. Commissioner,T.C. Memo 1977-42, 36 T.C.M. 182.), and the loss which he sustained upon its becoming worthless may be deducted only in accordance with sections 165(g)[7] and 1211.
To reflect the disposition of other issues not considered *134 herein Decision will be entered under Rule 155. Footnotes
1. Standard's right to do business in California was suspended by the State in 1969 because the corporation failed to pay the franchise tax which it owed.↩
2. Petitioner, James Barkley, and petitioner's secretary were the three incorporators of Standard. According to petitioner, under California law the incorporators of a corporation become its directors until they are replaced by action of the shareholders.↩
3. The high quality electronic recording and production equipment which Standard used in its business was either leased or financed by security agreements in the form of leases. In addition, a grand piano used in the business was acquired by an installment purchase.↩
4. See, e.g., Georgia-Pacific Corp. v. Commissioner,supra, (13 criteria); A. R. Lantz Co. v. United States,424 F.2d 1330, 1333 (C.A. 9) (11 criteria); Fin Hay Realty Co. v. United States,398 F.2d 694, 696 (C.A. 3) (16 criteria); Plumb, The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal, 26 Tax L. Rev. 369, 411-412↩.
5. By contrast, in Decker v. United States,244 F.Supp. 31, 33↩ (N.D. Iowa), a case on which petitioner relies heavily, "there was property in the [borrowing company] which could make Decker feel secure," and the loss resulted only from a fire which destroyed the company's uninsured principal asset.
6. Apart from Standard's potential capability to produce the long-playing background music tapes which Sutter needed (and which it had been purchasing for $75 each) and the availability of storage space for Sutter's equipment on Standard's premises, the business benefits which petitioner had hoped would flow from the relationship of the three companies were expected to accrue in favor of Standard rather than Sutter or KSFM (see supra,↩ pp. 7-8). These two benefits to Sutter could hardly have formed even the predominant part -- let alone, all but an insubstantial part -- of the motivation for petitioner's investment of over $20,000 in Standard. 7. The fact that no stock certificates were actually issued is irrelevant. Kalech v. Commissioner,23 T.C. 672, 681↩.