EDWARD R. HODGSON AND BERYL H. HODGSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
HODGSON v. COMMISSIONER
Docket No. 2053-77.
United States Tax Court
T.C. Memo 1979-8; 1979 Tax Ct. Memo LEXIS 524; 38 T.C.M. (CCH) 21; T.C.M. (RIA) 79008; January 3, 1979, Filed *524 Held: nature and character of losses incurred in investing in stock and debt of corporation determined. Joel L. Wertheim, for the petitioners. Theodore F. Brill, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined deficiencies in petitioners' income tax for the following years and in the following amounts: Taxable Year Ended
Deficiency
December 31, 1971 $ 319.33
December 31, 1972
9,920.04
$ 10,239.37
The issues for decision in this case revolve around the appropriate taxable years for petitioners' deduction under sections 165 and/or 166, I.R.C. 1954, of certain losses associated with the failure of Industrial & Aviation Supply, Inc. (IAS), a Florida corporation in which petitioner Edward Hodgson was a 75 percent shareholder, and whether *527 such losses are capital or ordinary. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. At the time they filed their petition herein, petitioners Edward R. Hodgson and Beryl H. Hodgson, were residents of Miami, Florida. Petitioners filed timely Federal income tax returns for both their taxable years here in issue with the internal revenue service at Chamblee, Georgia. On February 10, 1975 petitioners executed a form 872, Consent Fixing Period of Limitation upon Assessment of Income Tax, extending the statutory period of assessment of income taxes for their taxable year ended December 31, 1971 until December 31, 1975. On October 16, 1975 and October 19, 1975, petitioners executed a form 872 with respect to both their taxable years ended December 31, 1971 and 1972, extending the statute of limitations for those years until December 31, 1976. The statutory notice of deficiency, herein, was mailed to petitioners by certified mail on December 3, 1976. Petitioner Beryl H. Hodgson is a party hereto solely by virtue of having filed jointly with *528 her husband Edward R. Hodgson. All references herein to "petitioner" shall, therefore, be to Edward. Petitioner and Robert C. Lockhart (Lockhart) were long time friends and neighbors.Through the end of 1967 Lockhart had been employed by several corporations in the aviation and industrial supply business, either in their purchasing or sales departments. Prior to 1968 Lockhart had developed a variety of contacts in the fields of aviation and industrial supply. In 1971 and 1972, and from 1946 through the date of the trial herein, petitioner had been employed as an airline pilot for National Airlines (National). Petitioner's trade or business during the years in issue was flying airplanes for National. Sometime in late 1967 or early 1968 Lockhart approached petitioner with the idea of starting a new corporation to do business in the industrial and aviation supply fields. Lockhart had the know-how and connections but no funds. Petitioner, on the other hand, had money to invest. Of this combination was born Industrial & Aviation Supply, Inc., in 1968. The original incorporators of IAS were petitioner, Lockhart, and one Harry Dignum. When IAS was incorporated in March of *529 1968, petitioner exchanged $ 3,000 cash for 3,000 shares of $ 1 par value common stock and Dignum contributed $ 1,000 cash for 1,000 shares of IAS common. Simultaneously with his $ 3,000 contribution for stock, petitioner lent Lockhart $ 10,000 to enable Lockhart to participate in the equity of the corporation. The loan was made on the condition that Lockhart put the money immediately into IAS--which he did. Lockhart gave petitioner a promissory note as evidence of the loan obligation, and the 10,000 shares of stock represented by the $ 10,000 contributed by Lockhart were retained unissued in the corporation as security for the loan. It was understood that these 10,000 shares would be released to Lockhart when he paid off the loan, and that the loan would be paid off out of his share of future IAS dividends. Petitioner's 3,000 shares plus Dignum's 1,000 shares constituted all the issued and outstanding stock of the corporation during its entire existence. While petitioner, later in 1968, put in another $ 500 in exchange for stock, these extra 500 shares were, apparently, never issued to him and he continued to hold only 75 percent of all IAS's issued stock. Between August *530 1968 and December 1969 petitioner made bona fide loans on open account to IAS totaling $ 38,500. Despite these loans the company did not flourish. During this period the airline industry, a major hoped-for source of sales for the company, was at a low point. By early October 1971 the company had approximately $ 2,000 to $ 3,000 in face amount of accounts receivable and between $ 10,000 and $ 13,000 in accounts payable. On October 7, 1971 the Sheriff of Dade County, Florida, levied upon all the physical assets of the corporation in execution of a money judgment obtained against IAS by a third party creditor. All the assets of the corporation, except for its accounts receivable, were seized. The assets seized were sold at auction by the sheriff on November 17, 1971. The sale brought $ 225 to satisfy a judgment of over $ 1,200. This seizure of its assets virtually destroyed IAS. By the end of 1971 the corporation had survived almost two years without any influx of capital from petitioner, his last loan being at the end of 1969. While Lockhart and petitioner still kept alive a glimmer of hope that something would come along to save the company, this hope was not founded in fact. *531 After its inventory and other physical assets were seized and sold by the sheriff, the only business conducted by IAS was in the nature of those activities necessary to wind-up the business, receivables were collected and those payables for which money came available were paid. Lockhart, needing an income upon which he could support his family, got another job. In early 1972 IAS made a couple of small sales, as favors to old customers. These sales were of negligible value to the business. Since 1971 Lockhart has had a sometime rocky financial road to travel. He was forced to sell his house and move to an apartment. Petitioner has never tried to collect on the $ 10,000 note Lockhart gave him and has never pressured Lockhart for repayment. Including the $ 10,000 he lent Lockhart to get IAS started, petitioner's total investment in the business was $ 52,000. This $ 52,000 loss figure is composed of three separate categories of losses. These categories are: (1) petitioner's investment of $ 3,500 in IAS stock, (2) $ 38,500 in loans to the corporation, and (3) the $ 10,000 loan to Lockhart for the purpose of purchasing stock in IAS.
While petitioner contributed some small *532 amount of services to IAS by, for example, sometimes working around the company warehouse, co-signing checks, and loaning his car for company use, etc., petitioner never received any salary, commissions or fees from IAS. Petitioner provided his services to IAS at no charge because he hoped to benefit in the future from IAS's current growth. By providing free services to IAS, petitioner hoped to help it grow more quickly and surely. Petitioner's hopes for the company were three-fold: (1) that his stock would increase in value so as to provide a source of future gain, (2) that IAS might supply some sort of job for him when he retired from National, and (3) that his loans would be repaid (without interest). Petitioner's trade or business of flying was not directly related to the corporation's business. Petitioner was neither personally liable nor a surety for any of IAS's obligations at the time he made his various loans to the company. For his taxable year ended December 31, 1971, petitioner deducted $ 1,000 as an ordinary loss with respect to IAS's debts to him. For his taxable year ended December 31, 1972, petitioner deducted $ 45,000 as an ordinary loss under section 1244--again *533 with respect to his investment in IAS. IAS was at no time qualified under section 1244 as a small business corporation within the meaning of that section. OPINION This is a case wherein the propriety, and if proper, the nature and timing of certain loss deductions taken by petitioner in his taxable years ended December 31, 1971 and 1972 must be determined. At all times relevant hereto section 165, I.R.C. 1954, said in material part: SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * * * * *
(f) Capital Losses.--Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212. (g) *534 Worthless Securities.-- (1) General Rule.--If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. (2) Security Defined.--For purposes of this subsection, the term "security" means-- (A) a share of stock in a corporation; * * * All all times relevant hereto, Section 166 said in material part: SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly Worthless Debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness *535 Debt Defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. (e) Worthless Securities.--This section shall not apply to a debt which is evidenced by a security as defined in section 165(g)(2)(C). Preliminarily, we note that while petitioner was represented by counsel at the hearing held herein, neither petitioner nor petitioner's counsel favored us with a brief of petitioner's legal arguments herein. There is no indication in the record that petitioner's attorney withdrew, and no notification of his intent not to file a brief. Lacking petitioner's legal arguments on brief, we have done our best to discern petitioner's view of the law from what is available to us. We shall discuss in order each of the three categories of loss mentioned above. 1. $ 3,500 stock loss.
The parties stipulated that petitioner "invested $ 3,500.00 in [IAS] common stock at $ 1.00 per share" during 1968. From all the evidence we find that *536 petitioner, and all his co-incorporators, intended this contribution of cash for stock to be a capital investment. As found petitioner invested in the stock with the hope that it would appreciate in value and be a source of future gain, an obvious investment intention. There is nothing in the record to indicate that petitioner's shares in IAS were not capital assets in his hands.Thus we find ourselves in section 165(a) and section 165(g). Section 165(g) allows the owner of shares of stock in a corporation, in whose hands the shares are capital assets, a capital loss deduction for that taxable year in which the shares become worthless. [1] A loss is allowable under section 165(a) only for the taxable year in which the loss is sustained. Section 1.165-1(d)(1), Income Tax Regs. For this purpose, a loss is treated as sustained during the taxable year in which the loss is evidenced by closed and completed transactions and fixed by identifiable events occurring in the taxable year. Section 1.165-1(d)(1), Income Tax Regs. No loss is allowed *537 if there exists at the time of the loss a claim for reimbursement with respect to which there is a reasonable prospect of recovery. Section 1.165-1(d)(2)(i), Income Tax Regs.
We believe that the identifiable event fixing the worthlessness of petitioner's stock occurred in 1971 when all the physical assets of the corporation were levied upon to satisfy a judgment creditor's claim. After that time the corporation was rendered a lifeless hulk. It had no assets except its receivables, and those were burdened by payables in an amount three to four times the amount of the receivables. We have found that, after the seizure, there was no reasonable prospect that the corporation could recover. Petitioner cannot delay his loss deduction on the bare hope that the corporation could somehow be resurrected. Thus, in 1971 petitioner suffered a loss of $ 3,500 on his stock investment in IAS. Since petitioner had held the stock for over 6 months [2] at the time of the section 165(g) mandated *538 constructive sale or exchange thereof, we hold that petitioner suffered a $ 3,500 long-term capital loss in 1971, deductible within the limits of sections 1211 and 1212. 2. $ 38,500 bad debt loss.
The parties stipulated that between August 1968 and December 1969, petitioner "made loans totaling $ 38,500.00 to Industrial & Aviation Supply, Inc." We are satisfied, and have found, that these were bona fide debts by IAS to petitioner. These loans were not evidenced by a note or other writing, but were made on open account. Thus, these loans were not "securities" within the meaning of section 165(g), but were debts within the meaning of section 166. We have found that, at the end of 1971 after the sheriff of Dade County levied on IAS's physical assets, the prognosis for the corporation was poor. We found that petitioner's IAS stock became worthless in 1971. Different considerations do not apply to the corporation's debt obligations. On all the facts, we find that petitioner's open account loans to the corporation became totally worthless, along with the corporation and its stock, in 1971. See section 1.166-5(a)(2), Income Tax Regs.
*539 Having determined the year of petitioner's bad debt loss, we must now determine the nature of this loss, i.e., whether these losses are business or nonbusiness bad debts. To be business bad debts, the debts must have been created or acquired in connection with a trade or business of petitioner (section 166(d)(2)(A)), or incurred in petitioner's trade or business (section 166(d)(2)(B)). All other bad debts owned by an individual are nonbusiness bad debts. Section 166(d)(1). We believe, and have found, that petitioner's interest in IAS stock was as an investor. We also believe and find, from all the facts, that his loans to IAS were dominated by an investment motive. Merely "[devoting] one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged." Whipple v. Commissioner,373 U.S. 193, 202 (1963). Further, an investor in a corporation cannot render the corporation's business his own by merely devoting *540 some time to that business, as did petitioner in our case. The gain, if any, arising from investments, arises not from the investor's trade or business, but from that of the corporation. Whipple v. Commissioner,supra at 202. Thus, to be entitled to a business bad debt deduction, petitioner must show a "proximate" relationship between his trade or business of flying and his loans to IAS. Section 1.166-5(b)(2), Income Tax Regs. This he cannot do. While the question of whether a debt is a nonbusiness bad debt is a question of fact in each particular case, section 1.166-5(b)(2), Income Tax Regs., the test for whether a particular debt has a "proximate" relationship to petitioner's trade or business is set out in the case of United States v. Generes,405 U.S. 93, 103 (1972): We conclude that in determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business, as the Regulations specify, and thus qualifies as a business bad debt, the proper measure is that of dominant *541 motivation, and that only significant motivation is not sufficient. * * * We have found, from all the facts, that petitioner's dominant motive for investing in IAS was an investment motive. Petitioner's reasons for investing in IAS had nothing to do with protecting or somehow furthering his job at National, indeed they looked to a time when he would be retired from National. Since petitioner's motivation was aimed at possible future benefits, such as a return on his investment and possible future post-retirement employment, we conclude that petitioner's loans to IAS were nonbusiness debts whose worthlessness in 1971 resulted in a short term capital loss to petitioner in 1971 of $ 38,500. Section 166(d)(1)(B). 3. $ 10,000 loan to Lockhart.
Petitioner loaned $ 10,000 to Lockhart as a part of a plan whereby Lockhart put the money immediately into the corporation. Lockhart signed a note for the loan. Petitioner expected to be repaid the amount of the loan out of Lockhart's share of future IAS dividends. Lockhart never was issued the 10,000 shares of common stock represented by this $ 10,000 because these shares were held in the corporation as security for Lockhart's repayment *542 of the loan. On all the facts we believe that this loan to Lockhart created a valid debt owing petitioner from Lockhart. [3]
We find that the collection prospects from Lockhart are different than those from the corporation. We have no doubt that Lockhart believed he had at least a moral obligation to repay the $ 10,000 if he had sufficient funds. It was not until 1972 that the full effect of IAS's financial disaster fell upon Lockhart. He was forced to sell his house and to take other employment.We hold that the merger of IAS and Lockhart's personal financial problems in 1972 caused the $ 10,000 to become worthless as a nonbusiness bad debt in that year. Section 166(d)(1)(B). In summary we conclude, therefore, that for his taxable year ended December 31, 1971 petitioner suffered (1) a long-term capital loss of $ 3,500 and (2) a short-term capital loss of $ 38,500. For the year 1972 he suffered a short-term capital loss of $ 10,000. These losses are deductible within the limits set by sections 1211 and 1212 for the appropriate taxable *543 years. Decision will be entered under Rule 155.
Footnotes
1. If the shares are not capital assets, then the loss may be deductible under sec. 165(a) as an ordinary loss. Sec. 1.165-5(b), Income Tax Regs.↩
2. See sec. 1222(4).↩
3. We, of course, intend no inference with respect to the parties' present rights and obligations to each other, if any, under local law.↩