RUSSELL A. WARD and PATRICIA A. WARD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ward v. Commissioner
Docket No. 11515-83.
United States Tax Court
T.C. Memo 1984-424; 1984 Tax Ct. Memo LEXIS 249; 48 T.C.M. (CCH) 815; T.C.M. (RIA) 84424; August 8, 1984. Albert E. Anderson, for petitioners. Mark H. Howard, for respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In a statutory notice dated February 13, 1983, respondent determined a deficiency of $9,438.00 in petitioners' 1979 Federal income tax liability. Following concessions by petitioners, the only issue is the allowability of a $58,892.00 deduction [1] which petitioners claimed as a business bad debt. *251 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The petitioners, Russell A. Ward and Patricia A. Ward, are husband and wife and resided in Wheat Ridge, Colorado, at the time they filed their petition herein. Petitioners timely filed their 1979 joint Federal income tax return, Form 1040, and subsequently filed a timely amended return, Form 1040X. Patricia A. Ward is a petitioner in this case solely because she joined in filing those returns with Russell A. Ward. Subsequent references to "petitioner" refer only to Russell A. Ward. Petitioner is and has been employed full-time as an airline pilot for United Airlines for approximately twenty-eight years. Pursuant to regulations of the Federal Aviation Administration, he must retire upon reaching his 60th birthday, which will occur in February of 1985. The issue in this case arises out of petitioner's investment in a restaurant in Aspen, Colorado, known as "Don Giovanni's Fiesta Roma Ristoranti." The restaurant was owned by a corporation named "Don Giovanni's, Inc. (hereinafter referred to as "DGI"). Because of its location, the restaurant's business was seasonal in nature and primarily served skiers *252 who visited the popular recreational area during the winter months. DGI was incorporated under the laws of the State of Colorado on October 24, 1973. At the time of incorporation, the president and sole shareholder was Robert Rynearson. Details concerning the capital which was contributed to DGI are not contained in the record. The original articles of incorporation did not include a plan for the issuance of Section 1244 stock. Petitioner became involved in the business in or around 1975, in hopes of developing a supplementary retirement income through the restaurant. Initially, his involvement consisted of advancing money and visiting the restaurant once or twice a month in order to review the books and records and to check generally on the operations of the business. During 1975 and 1976, Petitioner made a number of cash advances to DGI and/or to Robert Rynearson personally for use in operating the restaurant. The dates of the advances, amounts and interest rates are set forth below: Date
Amount
Interest Rate
Jan 26, 1975
$20,000.00
12%
June 4, 1975
10,000.00
10%
Nov. 9, 1975
1,850.00
None stated
Dec. 29, 1975
10,000.00
None stated
Dec. 29, 1975
25,000.00
9.5%
Dec. 9, 1976
4,864.90
None stated
$71,714.90
Total Principal
Amount of Advances
*253 All advances except the last one were evidenced by promissory notes of DGI. The first three notes were also co-signed by Robert Rynearson. The last advance was a direct payment by petitioner to the respondent of employment taxes owed by DGI. On December 9, 1976, an agreement was entered into by petitioner, DGI, and Robert Rynearson in order to settle litigation which was then pending between them (the exact nature of which is not reflected in the record). As part of this agreement, all prior advances made by petitioner to DGI and/or Robert Rynearson were consolidated and a new promissory note was executed. The total of the advances made by petitioner to DGI and/or Robert Rynearson as of the date of the agreement was $71,714.90. Including accrued interest, the parties agreed upon a total liability of $80,821.87. A new promissory note was executed for this amount, bearing an interest rate of 9 1/2% and specifying that it was payable 30 days from December 9, 1976. The new note was signed by DGI and Robert Rynearson personally. The capital stock of DGI was pledged as security for the note. DGI and Robert Rynearson defaulted on the new note and petitioner, acting pursuant *254 to the terms of the security agreement under Colorado law, foreclosed and became the owner of all GSI stock on or about February 11, 1977. Initially, Mr. Rynearson contested the legality of petitioner's foreclosure action in court. However, on March 12, 1977, a settlement agreement of the foreclosure action was reached. The primary provisions of that agreement were that Rynearson agreed not to contest petitioner's foreclosure action by which petitioner received ownership of all GSI stock, and petitioner agreed to make all reasonable efforts to sell the stock to a third party by placing it on the market within one year from the date of the agreement. The "prime consideration" was stated to be that of selling a viable business entity, and to that end petitioner was allowed to operate the business as he saw fit prior to the contemplated sale. The agreement also provided for the division of the ultimate sales proceeds if and when the business was sold. First, outside creditors were to be paid. Then, petitioner was to be paid the amount owed to him as a result of the note dated December 9, 1976. Finally, any remaining proceeds were to be divided 80% to petitioner and 20% to Rynearson. *255 The same agreement also provided that "at the time of execution of this agreement, Rynearson shall be released from any obligations he has under the note dated December 9, 1976, given by Rynearson and the Corporation to Ward." There was no comparable provision releasing the corporation from liability. On February 13, 1977, a special meeting of the Board of Directors of DGI was held. At this meeting, a plan was adopted to issue stock pursuant to Section 1244 of the Internal Revenue Code of 1954, as amended. On the same date, DGI issued 3,750 new shares of stock to petitioner. Petitioner, as the sole shareholder, managed the restaurant himself for over a year, i.e., from February, 1977 to April, 1978. He was evidently fairly successful, with the corporation grossing some $180,000 to $200,000 per year and reducing the outstanding debt by some $23,000, during which time petitioner advanced $13,000 of his own money. The corporation therefore made an economic "profit" of approximately $10,000 during this period, and petitioner felt that he had turned the business around. The restaurant was listed with a real estate broker on January 30, 1978 at a stated *256 price of $172,500.00. An offer of $75,000 was received and a contract for purchase and sale of the assets of the restaurant was drawn up on or about April 16, 1978. The validity of the contract was made contingent upon the successful renegotiation of the lease by the purchaser with the landlord. The purchaser was unable to renegotiate the lease and therefore nullified the contract. Although the time frame is unclear from the record, the landlord subsequently served notice of eviction and evicted DGI.[2] A lawsuit was filed by DGI against the landlord. However, the landlord filed a bankruptcy petition in Federal court that is apparently still pending. Due to the fact that petitioner's claim against the landlord is an unsecured claim and to the presence of many secured claims, the likelihood of any recovery in that lawsuit is minimal. Respondent does not contest that petitioner's investment/loans became worthless in 1979. *257 OPINION The issue to be decided in this case is whether petitioners are entitled to an ordinary deduction as a result of a business bad debt for the cash advances that petitioner made to DGI. Respondent argues that the advances constituted contributions to capital or, in the alternative, that the debts were non-business bad debts. The initial inquiry, therefore, is whether the advances involved constituted bona fide loans or were actually contributions to capital, as respondent contends. Analysis of this issue involves a consideration of the facts in light of the traditional debt versus equity criteria that have been identified by this Court and others. These criteria include, among others, the formal indicia of debt, the availability of outside credit, the repayment history and prospects, whether there was subordination of the debt, the use made of the loan proceeds, whether participation in management occurred as a result of the advances, the adequacy of the capital structure (including the debt/equity ratios) and the intent of the parties. See, e.g., Dixie Dairies, Corp. v. Commissioner,74 T.C. 476, 493 (1980); United States v. Uneco, Inc.,532 F.2d 1204, 1207-1208 (8th Cir. 1976). *258 Having considered the record herein in light of the above criteria, we find that the advances were bona fide loans. With one exception (i.e., direct payment by Ward of the employment taxes,) promissory notes were issued for each advance made, and these usually included a stated interest rate and due date. Prospects for repayment of the notes appeared fairly good when the loans were made. There was no subordination of the loans when they were incurred.Significant participation in management by petitioner did not occur until after he took over ownership of the stock. Although there is not sufficient evidence in the record from which we can pass judgment on the adequacy of DGI's capital structure, we find that the parties intended that the advances be treated as debt. It is not true, as respondent suggests, that the outstanding debt was extinguished when petitioner took over ownership of the stock. The settlement document of March 12, 1977, provides that Mr. Rynearson was relieved of personal liability on the outstanding debt, but it did not so provide with respect to the corporation. Indeed, the same document provided that petitioner would be paid in amount owed to him under the *259 promissory note dated December 9, 1976, out of the sales proceeds. Having determined that the advances involved herein were bona fide debt, we now consider whether these debts constituted business or nonbusiness bad debts. Full deductibility from ordinary income is allowed for the worthlessness of business bad debts, whereas worthless nonbusiness bad debts are accorded short term capital loss treatment. Sections 166(a), and 166(d). [3]
In order to qualify as a business bad debt, the debt must have been created or acquired in connection with a trade or business of the taxpayer (section 166(d)(2)(A)), or the loss must have been incurred in petitioner's trade or business (section 166(d)(2)(B)). Petitioner must demonstrate that the loss resulting from the worthlessness of the debt bears a "proximate relationship" to a trade or business in which he was engaged at the time the debt became worthless. This is a question of fact. Sec. 1.166-5(b), Income Tax Regs.; United States v. Byck,325 F.2d 551 (5th Cir. 1963). *260 The test for determining whether a particular debt bears a "proximate relationship" to the taxpayer's trade or business was set forth by the Supreme Court in United States v. Generes,405 U.S. 93 (1972), as follows: [I]n determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business, as the Regulations specify, and thus qualifies as a business bad debt, the proper measure is that of dominant motivation, and that only significant motivation is not sufficient. (405 U.S. at 103). It has been held that a worthless bad debt resulting from a loan by a shareholder to a corporation may qualify as a business bad debt if the shareholder was engaged in the trade or business of promoting, organizing, financing, and selling businesses. Giblin v. Commissioner,227 F.2d 692 (5th Cir. 1955). It is clear, however, that if the interest of the lender is predominantly that of an investor, the debt will be characterized as a nonbusiness bad debt, because management of one's own investments, no matter how extensive, does not constitute a trade or business. Higgins v. Commissioner,312 U.S. 212 (1941). *261 In Whipple v. Commissioner,373 U.S. 193 (1963), the taxpayer was involved in numerous business ventures. The transactions in question consisted of loans which the taxpayer had made to a certain corporation in which he was a shareholder and for which he performed very substantial services. The Court held that the debts were nonbusiness bad debts and noted as follows: Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement of the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer. (373 U.S. at 202). Thus, for these purposes, a corporation is treated as a taxable entity separate from an individual taxpayer, and the trade or business of the corporation is not attributable to the individual. See, e.g., Deputy v. DuPont,308 U.S. 488, 493-494 (1940); Felmann v. Commissioner,77 T.C. 564, 568 (1981). *262 We believe that Whipple,supra, is dispositive of the instant case. Petitioner does not allege that he was in the business of promoting or selling businesses, but does allege that he was in the restaurant business. In order to establish a business separate and apart from that of the corporation, petitioner would have to show that the compensation he sought was other than the normal investor's return. Whipple,supra at 203. This he has failed to do. Petitioner states on brief that he made the loans for the purpose of obtaining a retirement trade or business. By this admission, it is clear that petitioner did not consider himself to be in the restaurant business at the time he made the loans, nor at the time they became worthless. Rather, he looked forward to the time when he would enter the restaurant business upon retiring from his trade or business of being an airline pilot. Petitioner attempts to distinguish Generes,supra, and Whipple,supra, on the basis that he, unlike the taxpayers in those cases, was not a shareholder at the time he made the loans.This difference is not significant *263 in light of petitioner's failure to establish that he was engaged in any trade or business (separate from the corporation) to which the debts were proximately related. Also, petitioner had become a shareholder, indeed the sole shareholder, by the time the debts became worthless which, according to Sec. 1.166-5(b), Income Tax Regs., is the relevant time upon which our inquiry should focus for purposes of section 166(d)(2)(B). The factual situation herein is very similar to that in Hodgson v. Commissioner,T.C. Memo. 1979-8. The petitioner in that case, an airline pilot employed by National Airlines, became a stockholder in and advanced money to a closely held corporation engaged in the aviation and industrial supply business. As in the instant case, petitioner became involved in the corporation with the hope that it would provide for him in his retirement years. This Court found that petitioner's dominant motive for becoming involved with the corporation was that of investment, and made the following observations: Petitioner's reasons for investing in IAS had nothing to do with protecting or somehow furthering his job at National, indeed they looked to a time *264 when he would be retired from National. Since petitioner's motivation was aimed at possible future benefits, such as a return on his investment and possible future post-retirement employment, we conclude that petitioner's loans to IAS were nonbusiness debts whose worthlessness in 1971 resulted in a short term capital loss to petitioner * * *. (38 T.C.M. 21, 25; 48 P-H Memo. T.C. par. 79,008 at 79-25). The motivation of petitioner herein was very similar to that of the taxpayer in Hodgson v. Commissioner,supra. Both looked to the corporation in which they were involved as a vehicle to provide future retirement benefits. In both cases, the loans extended to the corporations were not related to any current trade or business conducted by them when the debts became worthless. In light of the above analysis, we find that petitioner's dominant motivation was investment, and we hold that the debts involved were nonbusiness bad debts. Petitioner is entitled to a short-term capital loss, subject to the restrictions imposed on the deduction of capital losses by section 1211 and other appropriate code sections. Accordingly, Decision will *265 be entered for the respondent.
Footnotes
1. The actual deduction claimed on petitioner's Federal income tax return was $71,715. However, the parties have stipulated that $12,823 of this amount will be allowed as an ordinary loss, pursuant to section 1244 of the Internal Revenue Code of 1954↩, as amended. This represents the portion of petitioner's stock that was issued pursuant to a plan under that Code section following petitioner's acquisition of the stock involved in this case.
2. The eviction explains, in part, the sparseness in the evidence of records pertaining to the business. Petitioner states that they were stored on the premises and that he has been unable to obtain them due to the eviction and lack of cooperation on the part of the landlord.↩
3. Unless otherwise indicated, all section references refer to the Internal Revenue Code of 1954, as amended, and in effect during the taxable year in issue.↩